No. 37,620

HARRY W. POTTS (revived in the name of Ila Belle Potts and John H. Potts, executors of the last will and testament of Harry W. Potts, deceased), *Appellees* and *Cross-Appellants,* v. S. E. LUX, JR., *Appellant* and *Cross-Appellee,* RALPH T. McKNAUGHT and GEORGE LISTZ, *Defendants* and *Cross-Appellees.*

(214 P. 2d 277)

Opinion filed January 28, 1950.

*Tinkham Veale,* of Topeka, argued the cause, and was on the briefs for the appellant.

*John S. Dean, Jr.,* of Topeka, argued the cause, and *Randal C. Harvey,* of Topeka, was with him on the briefs for the appellees and cross-appellants.

The opinion of the court was delivered by

SMITH, J.: This was an action for an accounting and for money. Judgment was for the plaintiffs on some items and for the defendant on some. The defendant has appealed and the plaintiffs have cross-appealed.

The petition stated four causes of action.

The petition for the first cause of action alleged that in 1929 Potts and Lux agreed to engage in the wholesale mercantile business as partners; that Lux agreed to advance $100,000; and that at the same time Potts and Lux made arrangements to take Listz and Mc-Knaught into the business; it was agreed Lux was to receive five percent of $100,000 before any division of profits was made and then

the profits would be divided: Sixty percent to Lux; twenty percent to Potts; five percent to McKnaught; and five percent to Listz; and ten percent was to remain as a reserve in the business; and it was agreed that in case of liquidation those percentages would prevail after payment to Lux of his $100,000. The petition then alleged that it was determined the agreement under which they were operating should be put in writing and such an agreement was executed by all the parties.

This is set out here, as follows:

"Agreement between S. E. Lux Jr., Sole Owner of The Lux-Witwer Company, and Harry W. Potts, Ralph T. McKnaught and George Listz.

"S. E. Lux Jr. is to receive $5,000.00 (Five Thousand Dollars) representing five percent interest on his investment of $100,000 each year before any division of profit is to be made. After this interest is paid the remaining profits, if any, are to be divided on the following basis: Sixty percent to S. E. Lux Jr.; Twenty percent to Harry W. Potts; Five percent to Ralph T. McKnaught; Five percent to George Listz and the remaining ten percent to be placed in reserve to remain in the business until a substantial cash reserve is built up.

"If a Net Profit of One Thousand Dollars is earned, in addition to the Five per cent interest on $100,000 investment, then the following salary bonuses are to be paid: Harry W. Potts, Six Hundred dollars per year; Ralph T. McKnaught, Three Hundred dollars per year; George Listz, one Hundred and Eighty dollars per year. If One Thousand dollars net profit, in addition to the above mentioned interest charge, is not earned, then no salary bonuses will be paid for that year. The Net Profit mentioned above is to be figured after the regular reserves for Taxes, Depreciation, etc., have been set up. It is also agreed that, in order that the business may be adequately financed, there shall be no distribution of profits, nor disbursements of same, for the fiscal year but that this money shall remain in the business until December of the following year. At this time, distribution of the profits for the preceding year shall be made, provided the business has at that time earned a profit for the fiscal year of not less than $2,500.00 in addition to the $5,000.00 interest charge mentioned above.

"In the event of a liquidation of this business, then the percentages mentioned above are to prevail."

The petition then alleged that the above agreement remained in force until September 15, 1944, when the partnership was liquidated and since then Lux had exclusive possession; that for all the years the business had shown a profit except a loss of $2,818 in 1940, and this loss had been charged against accumulated profits; that in addition to the $100,000 put in by Lux all parties had made further investments in the business in the form of undistributed profits and it was alleged that the value of the property and assets were substantially in excess of the original investment of Lux and plaintiffs

believed this excess value amounted to $125,000 and Potts was entitled to twenty percent of this.

The second cause of action first made the allegation of the first cause a part. It then alleged that Potts was entitled to twenty percent of the profits but the amount paid him had not been the full amount to which he was entitled due to the fact that the personal income taxes of Lux had been charged to the expense of the business in the amount of $114,702.04. The petition then alleged that the provision of the agreement:

"The Net Profit mentioned above is to be figured after the regular reserves for Taxes, Depreciation, etc., have been set up."

referred to general property taxes and did not refer to the personal income taxes of Lux, Potts or any of the defendants, and this income tax was paid not only on the income of Lux from the business mentioned but on his income from other sources, and that by reason of this payment the actual net profits were $114,702.04 in excess of the amount upon which actual distribution has been made to Potts and he was entitled to twenty percent thereof, or $25,498.34.

For a third cause of action, plaintiffs referred to the allegations of the first and then alleged that the agreement provided that after the distribution, ninety percent of the profits to Potts and defendants "the remaining Ten per cent to be placed in reserve to remain in the business until a substantial cash reserve is built up"; that this agreement was followed until 1942, at which time Lux arbitrarily transferred this cash reserve to his son Samuel E. Lux III without the consent of Potts; that Potts had twenty percent interest in this reserve, which he believed would amount to twenty percent of $12,672.33, or $2,816.06.

The fourth cause of action alleged that Potts was entitled to twenty percent of the net profits of the business from January 1, 1944, to September 15, 1944, which profits he believed to be at least $40,000 and his share would be $8,888.88.

To apply to all the causes of action plaintiffs alleged defendant had in his possession the books of the company and about September 15, 1944, Potts demanded an accounting and settlement under the agreement, which was denied except as to the year 1944, and refused to make settlement unless Potts would accept it in full payment.

The petition further alleged that McKnaught and Listz were necessary parties because they were parties to the agreement and claimed some ownership in the business.

The prayer of the first cause of action was that the estate of Potts be declared the owner of a share in the business on September 15, 1944; that defendant be compelled to produce the records showing the extent of the property and assets on September 15, 1944, and that the court cause an appraisal thereof to be made as of such date and ascertain the liabilities thereof at that time, including the investment of Lux, and the undistributed profits of plaintiffs and for judgment for $27,777.76 or for twenty percent of the difference between the value of such assets and liabilities, with interest at six percent from September 15, 1944, and that the judgment be made a lien on the property of the company.

The prayer of the second, third and fourth causes of action was for a full accounting upon the items set out therein; in the second for $25,489.34, or such an amount as might be found due after the accounting; on the third cause of action in the amount of $2,816.06, or such amount as might be determined; and upon the fourth cause of action for $8,888.88, or as much as should be determined, with interest on all amounts at six percent from September 15, 1944.

To this petition Lux interposed a general demurrer on the ground of no cause of action filed. McKnaught and Listz demurred to each of the four causes of action on similar grounds. All defendants demurred to the pleading as a whole on the ground of misjoinder of parties. These demurrers were overruled and on appeal the judgment was affirmed. (See *Potts v. Lux,* 161 Kan. 217, 166 P. 2d 694.) Just what we said and held in that appeal will be treated later in this opinion. At any rate, the case went back to the trial court, where the defendants filed amended answers. The amended answer of Lux admitted that the plaintiffs were the executors of Potts' will and that the action had been revived in their name. The answer then admitted the oral and written agreements substantially as pleaded. The answer further admitted that Lux advanced $100,000 and that subsequently between 1929 and 1944 he advanced $53,-334.40, which included $10,000 transferred from his dividend account and on July 21, 1938, he advanced an additional $5,000 from his personal funds into the interest account, and that he advanced from his dividend account between December 31, 1937, and September 1, 1944, $45,849.71, which was due him under the contract. The answer further admitted that the company made profits each year from 1929 to 1943 except the years 1932 and 1940 and that the net profits were to be divided among the parties, as provided in the contract, and that Lux had paid or tendered to Potts all that was due him;

that at all times Lux was the sole owner of the business and Potts and the other defendants were his employees and were paid a salary and a bonus, as provided in the contract. The answer further alleged that about September 1, 1944, Potts resigned his position with the company on account of ill health and Lux made a full accounting and tendered to Potts all that was due him, less deduction for social security, but Potts demanded a much greater amount. A copy of the statement rendered was attached.

The answer further admitted that during the several years mentioned in the second cause of action deductions were made from the gross profits in determining the amount due Potts, McKnaught and Listz for income taxes paid on the income of Lux, but that when the contracts were entered into it was understood by the parties that these income taxes were to be deducted and such deductions appeared on every statement of account rendered by the auditors of the company to Potts and each year Potts and the other parties agreed to this deduction; that Potts made no objections to such deductions; that income taxes of Lux for the years 1941, 1942, 1943 and 1944 were paid in the amount of $135,376.91.

The answer referring to the third cause of action alleged that the ten percent of profits was placed in the reserve and held except for such portion as was distributed from time to time until January 1, 1940, when it was agreed that what had accumulated was to be distributed and from then on this ten percent was to be paid Samuel E. Lux III, who was to be employed by the company; that Samuel E. Lux III did enter the employ of the company and performed valuable services, and since that time with full consent of Potts had been paid; that Samuel E. Lux III continued in the service of the company from January 1, 1940, to September 1, 1944, except from August 7, 1943, to February 1, 1946, when he was in the military service.

Referring to the fourth cause of action, Lux admitted there was due Potts from the company $5,772 less deductions for social security and withholding taxes and he was tendered that amount but refused it. A further tender was made in the answer.

The answer further alleged that written statements of account showing all profits, disbursements, receipts, losses and gains in the business were prepared by competent accountants and each year a copy given to Potts, which disclosed the amount due each party, and these were discussed item by item and Potts and each of the parties accepted the amount shown to be due and each of these

statements constituted "an account stated" of the account of each of the parties to the contract.

The answer of McKnaught and Listz was to the same general effect, with the addition that they both disclaimed any right, title or interest in any of the property of the company, except such amounts as were due each of them from January 1, 1946, to the time of filing the answer under the terms of the contract.

The reply was a general denial with some special denials of no particular concern here.

Philip C. Gault was appointed referee. He heard testimony and arguments and on May 6, 1948, prepared and submitted to the parties a report containing findings of fact and conclusions of law. Motions by both parties to modify these were argued before the referee and on June 14, 1948, this report, together with a supplemental report, and a memorandum opinion was filed with the trial court. The referee made thirty-nine separate findings of fact. Some of the issues of fact were determined in favor of the plaintiffs and some in favor of the defendants. He made ten conclusions of law, some in favor of the plaintiffs and some in favor of the defendants.

On June 30, 1948, defendant Lux filed a motion for judgment on the findings and amendments to the findings of fact for the amount for which he had offered to confess judgment. He filed no motion for a new trial within three days nor any motion to modify the report.

The plaintiffs within three days after the referee filed his report filed a motion for a new trial on the first, third and fourth causes of action, motion for judgment on the report of the referee on the second cause of action and a detailed motion to modify findings and conclusions and for judgment. These motions were all overruled and the trial court entered judgment approving the referee's report in its entirety. On November 9, 1948, final judgment was entered for the plaintiffs and against Lux for $43,521.67, with interest at six percent on $34,775.61 from August 31, 1944. Conclusion of law No. IX was corrected to read:

"'Plaintiffs should recover judgment against S. E. Lux, Jr., in the following amounts:

On the first cause of action........................................ $5,078.58
On the second cause of action ..................................... 25,359.22
On the fourth cause of action...................................... 4,337.81
With interest on said amount at the rate of six percent per annum from August 31, 1944. . . .'"

On November 12, 1948, Lux filed a motion for a new trial, which was overruled. He appealed and in his notice of appeal recited that he appealed from the order overruling his motion for judgment on the findings, from the order refusing to set aside conclusions of law 6, 7 and 9, and for the reason there was no evidence upon which to predicate a verdict in excess of the amount tendered Potts by Lux, and from the judgment rendered on November 9, 1948. At this point it should be noted that the record does not disclose any motion to set aside conclusions of law 6, 7 and 9.

Ten specifications of error are set out, among them being that the trial court erred in overruling the motion of Lux to render judgment for him on the findings of fact of the referee, in approving conclusions of law 6, 7 and 9 of the referee's report, in entering judgment for plaintiffs in excess of the tender made by Lux, in entering judgment for plaintiffs upon the first cause of action, in entering judgment for plaintiffs in the second cause of action, in decreeing interest to the plaintiffs against Lux, in approving the seventh·conclusion of law, in holding that the annual statements were not accounts stated, in overruling defendant's demurrer to the evidence of plaintiffs, in overruling the appellant's motion for a new trial, and in refusing to adopt the requested conclusio; , of law of the defendant, numbered 8, 10, 11 and 12. It should be noted here that there was no timely motion for a new trial and no motion asking the trial court to adopt requested conclusions of law 8, 10, 11 and 12. The only motion directed at conclusions of law was filed with the referee.

The findings and conclusions of the referee were unfavorable to the plaintiffs on many items. Hence their cross-appeal. This will not receive our attention until we have disposed of defendants' appeal.

There is no controversy in this case but that Lux, Potts, McKnaught and Listz were associated together in the wholesale grocery business, at first under an oral contract, and later under the written contract pleaded, and that Potts severed his connection with the firm September 15, 1944. The answer of Lux admitted that the company made a profit in all but two years, and that after deducting items of expense provided for in the contract the net profits were to be divided among the parties according to the terms of the contract. The referee found in Finding No. 17 under the written agreement the termination of the connection of Harry W. Potts with the Lux-Witwer Company gave him a right to a share of the undistributed profits,

although there was no receivership, forced sale or liquidation in the ordinary sense. This finding is not attacked by the appellant here.

When Potts severed his connection with the company McKnaught made up a balance sheet purporting to show the financial condition of the company on August 31, 1944. At the trial of the action, this balance sheet was used as a starting point by both parties and the question tried was the amount of undistributed profits in the company on August 31, 1944. The contest as to the first cause of action centered around a number of items plaintiffs claimed should have been included in the undivided profits. On two of these the referee found for the plaintiffs and on the rest for the defendant. Appellant on his appeal argues that the referee should have found and the court should have given judgment for him on all these items.

The first of these deals with a fund we shall refer to as the reserve for bad debts. It is covered by Finding No. 22 of the referee's report. That was, as follows:

"FINDING No. 22

"In Plaintiffs' Exhibit 1, there is deducted from the amounts receivable the sum of $15,956.37. This reserve was accumulated through the years by charging to expense one-fourth of one percent of all credit sales and crediting same to this reserve; bad debts were charged against the reserve. Lux-Witwer had elected to set up a reserve in a percentage permissible under regulations of the Internal Revenue Bureau, instead of charging off its actual losses in bad debts.

"So far as the testimony shows the amount of the reserve did not necessarily indicate the probable losses, and in fact, there were no losses in any of the Accounts Receivable which made up the asset item on August 31, 1944. The fact that the accounts were all collected after August 31, 1944, is not conclusive of their fair value as of that date, but on the other hand there is no evidence to the effect that they were doubtful or worth less than their face value. Subsequent experience showed that they were worth their face value, and the fact that the governmental authorities frown upon distribution of parts of the reserve has no bearing on the true value of the accounts receivable; but their value had, however, a direct bearing on what were or were not undistributed profits to which plaintiffs under the contract are entitled to share.

"Plaintiffs should recover twenty percent of the $15,956.37, or $3,191.27, by elimination of the Reserve for Possible Loss."

As already noted, defendant filed no motion with the trial court outside of his belated motion for a new trial, to modify or change in any way the report of the referee, either as to findings of fact or conclusions of law. G. S. 1935, 60-2924, provides, in part, as follows:

". . . The report of the referees upon the whole issue stands as the decision of the court, and judgment may be entered thereon in the same manner as if the action had been tried by the court. When the referee is to report the facts, the report has the effect of a special verdict."

In this case the referee was appointed to hear and determine all the issues.

The section providing for a new trial is G. S. 1935, 60-3001. It provides, as follows:

"A new trial is a reëxamination in the same court of an issue of fact after a verdict by a jury, report of a referee or a decision by the court. The former verdict, report or decision shall be vacated and a new trial granted, on the application of the party aggrieved, when it appears that the rights of the party are substantially affected."

G. S. 1935, 60-3003 provides, as follows:

"The application for a new trial except for the cause of newly discovered evidence, must be made by written motion stating the grounds therefor, filed within three days after the verdict or decision is rendered, unless unavoidably prevented. Such motion may be heard and decided by the judge at chambers on reasonable notice to the parties."

It will be noted the referee found that plaintiffs should recover $3,191.27 on the first cause of action on account of this item. Appellant argues the trial court erred in refusing to sustain his motion for judgment on the findings as to this item. In his argument he quotes at some length from the testimony before the referee on this point.

At the outset we are confronted with the question of the extent to which this question may be considered by us in view of this record. Plaintiffs argue there is nothing here before us.

Appellant did not question the correctness of the findings of fact. This is accentuated by a statement in his brief, as follows:

"The only question raised now by Lux is, Should judgment be rendered by the court on the findings of the referee and the trial court?

"We are not in any way attempting to have the court amend or change the referee's findings of fact. We are satisfied with them. Why should we file a motion for a new trial under these circumstances?"

We have held that "the verdict or decision" referred to in the above statute includes the report of a referee on the whole issue. (See *Milling Co. v. Schreiber*, 102 Kan. 172, 169 Pac. 222.) That is a leading case on the subject. There we said:

"Under section 300 of the code, the report of a referee, determining the issues by findings of fact and conclusions of law separately stated, 'stands as the decision of the court,' and the first term of the equation stated above may

be substituted for its equivalent in section 306. The word 'verdict' as used in section 306 includes the report of a referee, when the issues of fact only are referred. There are two kinds of verdict, general and special (§ 294), and if the issues determined by either kind are to be reëxamined, it must be on motion for a new trial made within three days after the verdict is returned. But by express provision of section 300, 'when the referee is to report the facts the report has the effect of a special verdict.'

"The result of the foregoing is that the time limitation of three days contained in section 306 covers every form of trial, whether by jury, by referee, or by the court, and in case of trial by a referee must be computed from the time the report is filed."

The rule seems to have been first stated in *Bank v. Refining Co.*, 89 Kan. 738, 132 Pac. 832. There we said:

"Where a referee is appointed to take the evidence and report the facts in an action, the evidence is usually taken out of court and in the absence of the judge. In such case the court does not review the evidence, but renders judgment in accordance with the report of the referee unless objection thereto is made, and error can not be here predicated upon a judgment involving the correctness of the facts found as shown by such report, unless a motion for a new trial has been filed and overruled. Section 305 of the code of civil procedure makes the same provision for a new trial where a judgment is based upon the report of a referee as when based upon the verdict of a jury or a decision of the court."

See, also, *Alexander v. Clarkson*, 96 Kan. 174, 150 Pac. 576. There we said:

"There is some contention that no motion for a new trial was necessary because all that was asked was that plaintiff's exceptions to the findings be sustained and different findings made from those reported by the referee, but this required a new trial and made necessary a motion for a new trial."

We shall examine finding 22 with the idea of ascertaining whether it required a judgment for defendants on the item covered by it. The question being examined was whether the net worth figure in plaintiff's Exhibit 1, the balance sheet furnished Potts when he left the company September 1, 1944, was correct, or if not correct, what items should be added to it and what items taken away. The referee found that $15,956.37 should be added to it on account of a reserve fund for bad debts and that plaintiffs should recover twenty percent of that amount, or $3,191.27. It appears from the finding that under the regulations of the Internal Revenue Bureau a taxpayer has the option to either deduct as item of expense his actual losses and bad debts or to set up a reserve of one-fourth of one percent of accounts receivable as a reserve for bad debts. Defendants saw fit to adopt the latter course. Through the years they had operated by setting

aside such a percent. By the time Potts left this amounted to $15,-956.37. The finding shows that as a matter of fact there were no bad debts. The company was a good collector. The result was that this amount was a part of the assets of the company. Defendants argue that this fund was a trust account set up to remain during the period that the company was in operation and could not be distributed as an item of net profits. No authorities are cited to sustain this view nor are we favored with the regulation of the Treasury Department or any statement as to the practices. It would seem odd that the company would be required to keep this fund intact on its books "ad infinitum." Defendants quote at length from the record a colloquy between counsel for both parties at the time of the trial before the referee in which they argue counsel for plaintiffs conceded such to be the case. On account of the failure of defendants to file a timely motion for a new trial we shall not examine this record on the question whether the finding of fact was sustained by substantial evidence. Since this argument actually is directed at the proper conclusion of law to be drawn from the findings of fact we have examined it to see whether such a concession as is claimed by defendants was made by counsel for plaintiff. We find none. Defendants took the position that Potts was entitled to twenty percent of the current assets only. Once the accounting took the course that he was entitled at the time he left the company to twenty percent of the assets that had been built up through the years, then the conclusion is inescapable that this fund was part of the assets and Potts was entitled to his share of it. We conclude that this finding did not require a judgment for defendants as to this item.

The other item making up the judgment for plaintiffs on the first cause of action will be referred to as the item of fixed assets of the company. It consisted of warehouse equipment, trucks, office furniture and equipment and a store building located at Junction City. This item is dealt with in finding No. 24. The referee increased this item from $4,642.01, the amount at which this item was carried on the books of the company, to $14,078.57. These assets were carried on the balance sheet made up by McKnaught at the book value as $4,642.01. As a bookkeeping practice, this property was put on the books wherein it was acquired at some figure. The record does not disclose just how that figure was arrived at. At any rate for income tax purposes depreciation was taken each year. For instance, the book value of the warehouse equipment was $739.40, and against this

had been charged depreciation so that the book value for purposes of the balance sheet was $78.83. The same practice had been followed as to the other items. The referee found all these items were worth $9,436.56 more than the $4,642.01, at which the property had been carried on the balance sheet furnished Potts. Twenty percent of this was $1,887.31, for which judgment was entered. Defendants argue that there was no evidence at all upon which the referee based this increase in value of these assets. The defendants filed no motion for a new trial and did not attack this finding in any manner. They have insisted in their brief in this court that they were satisfied with the findings. The only motion they filed in the trial court was for judgment on this finding among others, that is, they argued before the trial court that even though this finding was correct, still they were entitled to judgment. In this court for the first time on appeal they make the argument that this finding was not sustained by the evidence. We shall not consider on appeal an error that was not presented to the trial court. (See *Waller v. Capper,* 143 Kan. 164, 53 P. 2d 836; *Lish v. Wehmeyer,* 158 Kan. 339, 147 P. 2d 712; and *Lechleitner v. Cummings,* 159 Kan. 171, 152 P. 2d 843.)

We have, however, examined the record on this point. The referee took the value at which these assets were put on the books and then noted how much this value had been depreciated. The result was so low that it would have been absurd to find this to be the actual value. There were included a Pontiac sedan and six trucks, one of them refrigerated. The book value was only $4,914.71, and this had been depreciated down to $1,380.70. In August, 1944, there was no established market price for this equipment. It would not do to take the replacement cost. That would not be fair to defendants. It would be too high. The referee considered the book value and original cost and disregarded the depreciation allowed to be taken by the revenue department. Original cost is a proper element to be considering in fixing value. (See 20 Am. Jur. 338, 339; *State v. Handler,* 142 Kan. 455, 50 P. 2d 977; and *City of Baxter Springs v. Foshay Co.,* 110 Kan. 409, 204 Pac. 678.)

We have concluded that finding 24 does not require judgment for the defendants.

We go now to a consideration of the second cause of action. This deals with an adjustment plantiffs argue should be made on the books of the company on account of the fact that the company paid the income taxes of S. E. Lux, Jr., during all the years the

company was in operation. The plaintiffs pleaded in their petition that the amounts paid Potts from time to time were not the full amounts due him because the net profits were decreased by charging the personal taxes of Lux to the expenses of the company. Lux admitted in his answer that deductions were made from the gross profits to pay his income taxes but alleged that the written contract had been interpreted by all the parties to mean that this should be done and further that the deductions appeared on each annual statement that was furnished each year to all the parties and all the parties, including Potts, agreed to them. The answer pleaded that from 1941 to 1944 taxes on the income of Lux, exclusive of income from Lux-Witwer, were deducted in the amount of $6,591.80, and for the same years taxes on his income were withheld in the amount of $128,785.11, making in the aggregate income taxes of Lux amounting to $135,376.91 were paid by the company and these payments were in the annual statements and accepted each year by all the parties.

The referee dealt with this question in finding 12, 13, 14, 27, 28, 29, 30, 31, 32 and 33. They are, as follows:

### "FINDING No. 12.

"During all of the time from 1929 to September 15, 1944, defendant Mc-Knaught had charge of the keeping of the books and records of the company, and kept such books under the direction and supervision of defendant Lux. Harry W. Potts had no part in keeping the books and records and was not consulted as to the manner in which they were kept. At least once a year, statements were prepared from such books and records by H. W. Gifford, of the firm of Brelsford & Gifford, certified public accountants.

### "FINDING No. 13

"The statements prepared by Mr. Gifford each year were taken direct from the books of the Lux-Witwer Company and no attempt was made to go behind the books and check other records. The statements therefore would not necessarily reflect actual values of the assets at any particular time. The statements would also contain the same errors which may have been in the books themselves. There was admittedly some 'loose bookkeeping,' but so far as the evidence shows, such 'loose bookkeeping' consisted for the most part in making somewhat unusual charges or credits to certain accounts. For example there is evidence that income taxes of S. E. Lux Jr., may have been charged to merchandise in 1939 and 1940 and, apparently for convenience, the investment in the Manhattan store was carried in Accounts Receivable.

### "FINDING No. 14

"The Gifford statements referred to in the above finding were ordinarily examined and discussed by Lux, Potts, Listz and McKnaught shortly after

they were prepared and delivered at least once a year; but the discussion was principally directed to increases or decreases in costs in the particular departments and the net results as to profit and loss. Many of the items in question in this case did not appear as separate items on these statements, and there is no evidence that any such were pointed out and separately discussed when the statements were examined. These statements were explained to some extent by Mr. McKnaught, but the explanation was not sufficient to enable either Lux or Listz to explain any of the items on any of the statements, or the form and contents of the statements generally. Neither Listz nor Potts had any contact with the bookkeeping part of the business or any knowledge of the books from which these statements were prepared and Lux had very little, if anything, to do with the keeping of the books. It must be concluded (even allowing for the natural failure, because of lapse of time, to remember particular meetings) that the examinations of the statements were not more than cursory; but there is no evidence of any deliberate attempt to conceal facts or any attempt on the part of anyone to restrict discussion or limit inquiries of any of the associates.

### "FINDING No. 15

"The documentary evidence introduced tends, for the most part, to show that the parties regarded the organization as a sole ownership rather than a partnership.

"(1) The 1939 agreement refers to S. E. Lux, Jr., as Sole Owner.

"(2) The financial statements and balance sheets are obviously set up on the theory of sole ownership. The use of such terms as 'Employees' Accounts' to refer to amounts not withdrawn by Potts, McKnaught and Listz and 'Net Worth' to refer to Lux's capital investment plus his share of profits not withdrawn (exclusive of his interest account) would not be appropriate to a partnership or ordinary joint enterprise. Neither this nor other bookkeeping methods are conclusive, of course, because it is not shown that Potts had anything whatever to do with the books or statements; on the contrary, it is definitely shown that he had nothing to do with their preparation. Nevertheless, the statements and other documentary evidence are competent evidence to show how the parties (other than Potts and perhaps Listz) interpreted the arrangement and it is significant that there is no documentary evidence that definitely supports the partnership theory, unless it is the original agreement itself.

"(3) Personal property statements were filed in the name of Lux-Witwer Company, and signed either by Lux or McKnaught.

"(4) Leases and insurance policies were taken in the name of S. E. Lux, Jr., doing business as the Lux-Witwer Company, as was the indemnity bond on employees handling money.

"(5) Tax returns and licenses of various kinds were, for the most part, made in the name of S. E. Lux, Jr., doing business as the Lux-Witwer Company, and some of these documents refer to Lux as 'individual owner' or 'owner.'

"(6) The forclosure proceedings in connection with the Trego County farm were brought in the name of S. E. Lux, Jr., doing business as ·the

Lux-Witwer Company, and the sheriff's deed resulting was issued in that style.

"(7) The bank account, letterheads, invoices, advertising and directory listings were in the name of the Lux-Witwer Company, with nothing to indicate whether the company was solely owned, a partnership or joint enterprise.

"(8) No partnership returns were filed with the Collector of Internal Revenue. Lux never reported any income from a partnership. Potts reported no income from a partnership in 1943 or 1944 and there is no evidence that he ever reported any income as partnership income.

### "FINDING No. 16

"Late in August of 1944, it was agreed that Potts would terminate his connection with the Lux-Witwer Company. He was not discharged and the decision was apparently his own, although it is not clear whether it came about on account of illness or because Potts felt that his associates thought he was no longer of value to the company. Plaintiffs allege that the time of termination was September 15, 1944, and that Potts' compensation or share of the assets should be computed as of that date. McKnaught's original answer admitted that September 15 was the date agreed upon but his amended answer stated that the date of termination of Potts' employment was September 1, 1944, and McKnaught testified that Potts had agreed to work until September 15 for his salary alone, in order that McKnaught would have time to prepare a statement as of September 1. There is no other testimony directly on this point, although there is no question but that Potts did work until September 15. Although McKnaught's verified original answer gave the date as September 15, his amended answer conforms to the proof. As in other disputed points, it is regrettable that there was no way to hear Potts' testimony on what was admittedly an oral agreement, but the referee finds that the allegations in the petition, although first admitted by McKnaught's original answer, and the fact that Potts worked until September 15, are outweighed by the amended answer, supported by proof, and by the fact that the statement itself, prepared for the very occasion, was as of August 31. Some stopping point would be necessary at the end of any profit sharing agreement, and September 1 would be the normal date, if, as is agreed, Potts had definitely withdrawn in the latter part of August.

### "FINDING No. 17

"Under the written agreement the termination of the connection of Harry W. Potts with the Lux-Witwer Company gave him a right to a share of the undistributed profits although there was no receivership, forced sale, or liquidation in the ordinary sense. The defendants submitted to Potts a statement which was prepared by McKnaught, and it has been put in evidence as Plaintiffs' Exhibit 1 and is made a part of these findings by reference. This exhibit consists of two pages, the first of which purports to show income and expenses from January 1 to August 31, 1944; the second page purports to show assets and liabilities on August 31, 1944. Defendants tendered·to Potts twenty percent of the net profit shown on Exhibit 1, or $5,772.00, less withholding and social security taxes, but Potts refused to accept the tender in full settlement. On account of certain errors or duplication of items brought

out in the course of the hearings, the tender was increased to $6,642.49, less withholding taxes and less an item of $1,544.19 representing withholding tax on amounts paid Potts in 1943, which defendants claim were, by error, not deducted, but paid by defendant Lux. The omission to deduct the 1943 withholding tax from Potts' 1943 compensation was not pleaded in defendants' answers except as it may be included in the admission that 'the sum of $5,662.00, less lawful deductions for Social Security and withholding taxes' was due Potts. It is clear that the statement contained no substantial deviation from the usual methods of preparing statements—that is, the items so far as could be, were taken from the regular books, and no attempt was made to fix actual values where they differed from the book values. Certain items were necessarily estimated; in particular, the item of merchandise inventory, because an actual inventory of merchandise in the Lux building was not taken at the time. However, there seems to be no serious dispute concerning this particular item; there is testimony that Potts estimated the value of the merchandise in the Lux. building to be $90,000.00, that Lux's estimate was $95,000.00, and that the latter figure was used.

## "FINDING No. 18

"The assets of the Lux-Witwer Company on August 31, 1944, consisted of merchandise on hand, office equipment, warehouse equipment, automobile equipment, a building at Junction City on land leased from the Union Pacific Railroad, a retail store at Manhattan known as the Quality Market, cash on hand and on deposit, accounts receivable, and good will.

"The second page of Plaintiffs' Exhibit 1 is a balance sheet, which constitutes the only account submitted to plaintiffs by defendants purporting to show the assets of Lux-Witwer on August 31, 1944. The items on the balance sheet which have not been questioned or which conform to the evidence should be accepted as correct.

"Any assets not reflected in the balance sheet which represent undivided profits in which plaintiffs should share should be added, and questioned items should be revised to conform to the evidence.

## "FINDING No. 19

"The balance sheet shows an item of $68,334.00 designated 'S. E. Lux, Jr.-Interest Account.' The evidence and exhibits show that this is a correct statement of accumulation of interest due Lux on his original investment of $100,000.00, and which was not withdrawn by him, but left in the business.

"The balance sheet further shows an item of $173,860.00 designated 'Balance Net Worth 8/31/44.' The form of balance sheet is clearly based on the assumption that the Lux-Witwer Company was solely owned by S. E. Lux, Jr. Under that theory, the item, together with the Interest Account, represents the net worth of S. E. Lux, Jr., doing business as Lux-Witwer Company, before distribution to the employees of their percentages of profits for the first eight months of 1944. Upon the system of bookkeeping used, the item is necessarily made up of $100,000.00 original capital, to which plaintiffs make no claim, plus the accumulation of that part of Lux's sixty percent share in the profits which he had not withdrawn. It could not accumulate any other way but by writing

up of asset values, or by manipulation of the books whereby what should have been credited to other accounts was added to net worth. There is no evidence to indicate any writing up, or wrongful additions in bookkeeping. It follows that apart from Potts' share in the 1944 profits included in the item, he has no right to any part of the 'Net Worth' item as such.

"FINDING No. 20

"About 1934 or 1935, the Lux-Witwer Company acquired a retail grocery store in Manhattan, Kansas, known as the Quality Market. Certain merchandise was originally acquired in satisfaction of a debt and the parties decided to operate the store, which they did, taking over the debtor's lease. Between 1935 and 1944 the store earned over $35,000.00 in net profits, and had net worth according to its statement of $21,363.94, on April 15, 1944, which was the last time a balance sheet was prepared prior to August 31, 1944.

"The original debt owed Lux-Witwer was paid out of the profits of the store, but the Quality Market was not set up as a separate asset on the Lux-Witwer books. Instead, the matter was handled by setting up two accounts in Lux-Witwer's accounts receivable ledger, one of which was for merchandise purchased from Lux-Witwer, just as in the case of other retail customers. This account need not be considered further, because it has no bearing on the issues.

"The other account may be designated Quality Market 'Profit and Loss Account.' Quality Market had its own set of books from which its profits were determined each year. Such profits were in each year credited to Lux-Witwer's Sales Account, and as no compensating amount of merchandise went out of Lux-Witwer's stock, the method had the effect of adding in each year Quality Market's profit to Lux-Witwer's gross profit. The same amount credited to sales was charged on the Lux-Witwer's books to the 'Profit and Loss' account receivable, that being the offsetting entry. Now, this yearly profit was not necessarily cash—in fact it certainly was not all cash in any year—but it was a realized profit whether invested in fixtures, additional stock, or what not, and that part not actually withdrawn had the effect of increasing the net worth of Quality Market as shown on its own books. In other words, as the account started from scratch, so to speak, a net worth could only be built up from profits, and the net worth of Quality Market shown on its balance sheet must represent profits not distributed in cash.

"The fact to be determined is therefore narrowed to the answer to this question: Is the net worth of Quality Market carried in the Lux-Witwer statement in any form as an asset? If it is not, then the plaintiffs would be entitled to a percentage of it as it would represent undistributed profits not disclosed by Exhibit 1. On the other hand, if it is so carried (and obviously, if carried, it is in Accounts Receivable), Potts had already received his share because all net profits of Quality Market, including that part plowed back in the business and represented by the term 'net worth' had been in previous years added to Lux-Witwer's gross profits.

"The testimony on the point is somewhat confusing, and plaintiffs contend that the testimony of McKnaught was not consistent. It is true that his testimony as plaintiffs' witness includes an answer which would, taken alone, indi-

cate that apart from Quality Market's current account (merchandise purchased from Lux-Witwer in the ordinary course of business) nothing was carried as a Quality Market asset in the Lux-Witwer Books. At that time no balance sheet of Quality Market had been introduced, and consequently there were no inquiries directed to the item of 'net worth' on what was later introduced as Plaintiffs' Exhibit 27.

"As defendants' witness, McKnaught, on cross examination, testified that the net worth was 'carried in our Accounts Receivable,' and stated that Quality Market had no capital account. This statement was borne out by Gifford. This witness also said that he had seen balance sheets of the Quality Market on occasions and that the net worth shown there agreed with the balance in the Accounts Receivable (Profit and Loss Account of Quality Market). McKnaught's final testimony on the subject is also consistent with this view, and, in fact, this unorthodox method of handling the bookkeeping relating to the Manhattan store having once been adopted, the result would necessarily be that the Profit and Loss acount would reflect the net worth of the Quality Market; otherwise the books would not balance. The only other explanation would be that only cash withdrawn, not the actual profits, were credited to Lux-Witwer sales each year, and there is no testimony indicating that.

"It now appears that it would have been better to introduce the ledger sheets of this Profit and Loss Account, in order that the balance could be checked with the Net Worth item, but what are at first glance inconsistencies in the testimony may very well have resulted from misunderstandings as to the ultimate result of the bookkeeping entries concerning which the witness testified.

"The finding on the point is that nothing additional is due the plaintiffs on account of the Quality Market transaction.

"FINDING No. 21

"Between 1939 and 1941 the Lux-Witwer Company acquired a half section of land in Trego County, Kansas, generally referred to in the evidence as the Trego County farm. This farm was acquired by foreclosure of a mortgage given to secure a merchandise debt to the company, and was carried on the books and statements of the company for 1941 and 1942 as an asset at the book value of $8,451.85, representing the original merchandise account of about $6,000.00 plus a first mortgage paid off by Lux-Witwer, and expense of foreclosure.

"This farm was sold on December 15, 1943, for $8,000.00 and was not carried on the Lux-Witwer balance sheet thereafter. The comparative Income and Expense accounts of Plaintiffs' Exhibit 17 reflect the rental income from the farm and an expense item in 1943 of $451.85, which according to the testimony represented the book loss on the Trego County farm. There is not on Exhibit 17 any specific item showing how the $8,000.00 proceeds of the sale of the farm was credited, but it would in the ordinary course of business have been credited to sales and would be reflected in the balance sheet by an increase in the item 'Cash in Bank.' In the absence of evidence to the contrary, it should be assumed that such was the case, even though the 'Sales'

item does not separate sales of merchandise from other sales. No departure from the usual method of bookkeeping is shown in this exhibit, and it cannot fairly be assumed that 'Sales' represented only ordinary sales of merchandise. It no doubt included not only the Trego farm proceeds, but also profits of the Quality Market (see Finding 20), which were not actually sales of merchandise.

"The finding is that plaintiffs should recover nothing on account of the Trego farm transaction.

### "FINDING No. 22

"In Plaintiffs' Exhibit 1, there is deducted from the accounts receivable the sum of $15,956.37. This reserve was accumulated through the years by charging to expense one-fourth of one percent of all credit sales and crediting same to this reserve; bad debts were charged against the reserve. Lux-Witwer had elected to set up a reserve in a percentage permissible under regulations of the Internal Revenue Bureau, instead of charging off its actual losses in bad debts.

"So far as the testimony shows the amount of the reserve did not necessarily indicate the probable losses, and in fact, there were no losses in any of the Accounts Receivable which made up the asset item on August 31, 1944. The fact that the accounts were all collected after August 31, 1944, is not conclusive of their fair value as of that date, but on the other hand there is no evidence to the effect that they were doubtful or worth less than their face value. Subsequent experience showed that they were worth their face value, and the fact that the governmental authorities frown upon distribution of parts of the reserve has no bearing on the true value of the accounts receivable; but their value had, however, a direct bearing on what were or were not undistributed profits to which plaintiffs under the contract are entitled to share.

"Plaintiffs should recover twenty percent of the $15,956.37, or $3,191.27, by elimination of the Reserve for Possible Loss.

### "FINDING No. 23

"About May 1, 1936, the Lux-Witwer Company moved into the building at 125 North Kansas Avenue and occupied it continuously to August 31, 1944. During this period the Lux-Witwer Company paid to S. E. Lux, Jr., $550.00 per month rent for the building. During the same period S. E. Lux, Jr., leased this building from the National Bank of Topeka, Trustee of the S. E. Lux, Sr., Estate, at a rental of $400.00 per month up to September, 1942, and at $250.00 per month from September, 1942, to the end of the period. Lux retained the difference between the $550.00 per month collected from Lux-Witwer and the rent paid by him to the Trustee. It is indicated that McKnaught believed the entire rental paid by Lux-Witwer went to the Trustee. Lux testified that for the first part of the period the difference was accounted for by the fact that he rather than the Lux, Sr., Estate, had installed and owned the refrigeration equipment and that it had been agreed with his father that Lux, Jr., owned the refrigeration equipment and was entitled to part of the rent. This is borne out by a previous lease made in 1927 between S. E. Lux, Sr., and S. E. Lux, Jr. This lease not only set out what property belonged to S. E. Lux, Jr., but also provided that on account of it he should receive two-fifths of the

rent (at that time there was a sublease to United Stores). The latter increase in the amount Lux withheld (after 1943) he accounted for by testifying that the arrangement had been agreed upon with the other beneficiaries in the trust estate, his three sisters who had no money to take care of repairs (their written consent is attached to the lease), that he took care of repairs, putting on several new roofs, fixing the elevator, etc. In his testimony later he stated he did not recall any particular instances of repairs that he had paid for himself, but said that there had been some.

"Plaintiffs contend that Lux's retention of part of the rent constituted a breach of faith with his associates and that his personal account should be charged with the amounts retained. However, there is no evidence indicating that $550.00 per month was an unreasonable rent for the building, except what might be implied from what the Trustee was willing to accept. There is no evidence showing whether or not the trustee and beneficiaries knew what Lux-Witwer was paying. Lux was of course under a duty as a party to the profit sharing contract and also holder of the building lease, not to charge Lux-Witwer with a rent which was unreasonably high, because such an action would reduce his associates' profits while enlarging his own outside income. But as stated above, the evidence does not show that the building rent was out of line; and if Lux had a duty to account for the amounts he retained, the duty would be primarily one to his sister, not to his profit sharing associates, who had no right under the contract to except [expect] that the Lux-Witwer Company would be charged less than a fair and reasonable rental for the building.

"The finding therefore is that plaintiffs should recover nothing on account of the rentals.

"FINDING No. 24

"On Plaintiffs' Exhibit 1, one of the assets listed is 'Book Value-Fixed Assets-$4,642.01.' The testimony and exhibits show that this was made up of the following items:

| | |
|---|---:|
| "Warehouse Equipment | 739.40 |
| Office Equipment | 5,170.97 |
| Automobile Equipment | 4,914.71 |
| Building—Junction City | 2,920.84 |
| Equipment—Junction City | 332.65 |
| | $14,078.57 |
| Less Accumulated Depreciation | 9,436.56 |
| | $4,642.01 |

"The book value, of course, has no relation to the actual value as of August 31, 1944.

"The warehouse equipment included at that time about six two-wheel trucks worth $39.00 each, eight or ten flat trucks worth $50.00 to $60.00 each, three scales worth $25.00 to $30.00 each, and some smaller articles such as benches and scoops. Some of the warehouse equipment still used belonged to Lux before 1929.

"Office equipment included three typewriters, two adding machines, seven desks and chairs, fifteen stacks of filing cases, a comptometer, linoleum,

fluorescent light, gas heater, electric fans, signs, and a Burroughs posting machine which had cost $1,854.00 in 1942.

"The automobile equipment included six delivery trucks, one of which was specially built with refrigeration equipment, and one 1942 Pontiac sedan.

"The Junction City building was constructed on leased ground in 1941 at a cost of $2,920.84. Equipment in connection with it was refrigeration equipment. It had been used as a warehouse for a short time but was later rented to the Concordia Ice Cream Company. The rent in 1944 was $90.00 per month. The average net income for 1942, 1943 and 1944 was about $270.00 per year.

"There is very little evidence on which to base a finding of the value of the Fixed Assets as of August 31, 1944. A finding based on replacement value would certainly be unfair, and many of the items simply could not have been replaced at that time. On the other hand, the book value after depreciation, is clearly too low and no doubt would be too low on almost any date, because as much depreciation is usually taken for tax purposes as may be allowed by the Internal Revenue Department.

"The Junction City property on the basis of net return would probably have been worth $5,000.00, or even $6,000.00, if one were to value it on the assumption that war-time conditions would continue indefinitely.

"It seems probable that the actual worth of the Fixed Assets at the date in question was equal to the book value before deducting accumulated depreciation. It is necessarily an approximation, in the absence of evidence on each item. In making the approximation the referee has in mind the probable fact that the Fixed Assets could have been sold for substantially more at the time, but that a fair evaluation should not be based on temporary conditions of scarcity.

"The amount of $9,436.56 should be added as undivided profits under the contract, and plaintiffs should recover twenty per cent of that amount, or $1887.31, on account of undervaluation of the fixed assets on the balance sheet.

### "FINDING No. 25

"In 1921 S. E. Lux, Jr., had installed in the building later occupied by Lux-Witwer refrigerator equipment at an expense of $25,000.00 or $30,000.00. This equipment was his personal property (see Finding 23), and he kept it in repair while the building was rented to United Stores. After Lux-Witwer moved in in 1936 the company made the necessary repairs.

"In 1938 the Lux-Witwer Company entered the business of handling frozen foods. For this purpose a large room was equipped with additional insulation, sufficient to permit a temperature of zero to be maintained. The expense of the equipment in this room was not capitalized, and there is no item on the balance sheet representing the asset value of the refrigeration equipment, although on the December 31, 1945, balance sheet a frozen food refrigeration room appeared on the balance sheet in the amount of $20,117.68. Defendants testified that this item represented additional refrigeration equipment installed in a separate building after Potts left the company. McKnaught and Lux testified that the refrigeration rooms in use throughout the time Potts was with the company were from time to time repaired, and replacement of in-

sulation made frequently; that the special equipment in 1938 was simply additional insulation. The expense of repair and replacement was substantial but the evidence as a whole does not support the plaintiffs' contention that amounts so charged to expenses were actually capital expenditures which should have been shown as capital assets on the balance sheet, and the referee therefore finds nothing is due the plaintiffs on account of the refrigeration equipment.

### "FINDING No. 26

"On August 31, 1944, the Lux-Witwer Company had been in operation fifteen years. It had favorable contacts with brokers and customers and was a going business. Over a ten year period its average yearly sales had exceeded $1,100,000 and its average net profits had been over $32,000.00 a year. In the five years preceding August, 1944, its annual net profits had averaged over $42,000.00. These average earnings included amounts paid as interest and amounts paid for income taxes. Its quotas had been set up so that it could get merchandise under government rationing, and through its contacts with producers and brokers in the past, it was able to get goods which were scarce at that time. Much of this favorable treatment was due to Potts' personal standing in the industry.

"The good will of such a business has a value and a business is ordinarily worth more as a going concern than the worth as shown on its balance sheet, assuming, as in this case, that good will was not given any value in the statement. Ned Fleming, a witness with extensive knowledge of the wholesale food business, testified that there was a pretty generally accepted formula in that business for estimating the total value of a business—that formula was eight times the average earnings over a period of five or ten years. Using this formula for the ten year period, the value over and above this statement would be in the neighborhood of $70,000.00, which would necessarily be a valuation of good will. Use of the five year period would about double this valuation of good will.

"If Lux-Witwer Company had been a partnership the plaintiffs would have been entitled to a percentage of the value of the good will (*Gelphman vs. Gelphman*, 142 Kansas 582), but in view of the conclusion that the contract was really one of employment, with profit sharing features, the finding on this point must be that plaintiffs are not entitled to any part of the estimated value of good will.

### "FINDING No. 27

"The statements from 1929 to 1938, inclusive, show no payments by Lux-Witwer Company for state or federal income taxes for any person, and Gifford, who prepared the statements, testified that he was certain that the S. E. Lux, Jr., income taxes were not charged to expense prior to 1939. He also testified that he had been informed by an agent of the Bureau of Internal Revenue that in 1939 and 1940 S. E. Lux, Jr's, federal income taxes (which would be his taxes for 1938 and 1939) were paid by Lux-Witwer and charged to 'merchandise purchases.' In the absence of evidence to the contrary, the finding must be that the Lux income taxes were first paid by Lux-Witwer Company in 1939 and charged to expense under the heading 'merchandise purchases,' as was also the case in 1940.

## "FINDING No. 28

"In 1941, for the first and only time certain income taxes of S. E. Lux, Jr., were carried on the statement as such, in the amount of $5,184.15. This item represented a special charge resulting from an investigation of the Internal Revenue Department covering four or five previous years. It did not represent 1940 or current taxes. In this case plaintiffs concede that all parties sharing in profits had benefitted by the errors which caused the profits to be recalculated, had received additional distributions thereby and they make no claim for a share of this item. This does not seem consistent with plaintiff's position on the other income tax items, because the concession apparently has the effect of saying that had the errors not been made, the payment of Lux's income tax by Lux-Witwer would have been a proper deduction from profits in which Potts shared. However, this particular item had been discussed by all parties and it might very well be held under the evidence that Potts expressly consented to the charge.

## "FINDING No. 29

"In 1940 the Lux-Witwer Company made no profit, and none of the personal income taxes of S. E. Lux, Jr., for the year 1940 were paid by the company or charged to expense on its books. At that time both state and federal income taxes were payable in the year following the year in which the income was earned, so that 1940 taxes would have been payable in 1941, but the only tax paid in 1941 was the special charge mentioned in Finding 28, which was paid in one payment in October, 1941, and was not the 1940 tax.

## "FINDING No. 30

"The entire personal income taxes of S. E. Lux, Jr., including that attributable to his income other than that from Lux-Witwer Company, for the years 1941, 1942, 1943 and 1944, were paid from Lux-Witwer funds and charged to expense. The taxes were included under the heading of 'Taxes and Licenses', which appeared on the statements which were furnished at the end of each year, but the evidence tends to show that the item was not specially discussed, if at all, in the meetings.

## "FINDING No. 31

"It is not alleged, or shown by the evidence, that there was any modification of the written contract of 1933 insofar as it related to taxes, and defendants state that the contract was interpreted from the beginning by all the parties to authorize the payment of the personal income taxes of S. E. Lux, Jr.

"Strictly speaking, that part of the contract under which the company was being operated in 1941 to 1944 contains no mention of taxes. The word 'taxes' appears only in the paragraph relating to salary bonuses of specific amounts to Potts, McKnaught and Listz (not to Lux). These bonuses were discontinued before 1941. The following is the only sentence referring to taxes:

" 'The Net Profit mentioned above is to be figured after the regular reserves for Taxes, Depreciation, etc., have been set up.'

"The term 'Net Profit' is used for the first time in the contract at the beginning of this same paragraph; and in all other parts of the contract, including

the paragraph fixing the shares in percentages, the words used are 'profit' or 'profits', without definition.

"Assuming, however, for the purpose of this finding, that the quoted sentence was intended to refer to profit or profits, wherever mentioned, there remains the question of whether it would justify a charge for the Lux personal income taxes. Granting the defendants' contention that the parties had a legal right to make such a contract, it would still be such an extraordinary business arrangement that only specific words or very positive evidence that Potts so interpreted it would justify a finding that the contract authorized the charge. Bearing in mind that this was not a corporation, the ordinary and reasonable meaning of the word 'taxes' is property and license taxes. The defendants' interpretation could even have cut down Potts' share when the company's earnings were highest, if Lux's sixty percent, added to his outside income were taxed in very high brackets. The mere mechanics of computing Lux's taxes, if they were to be charged to Lux-Witwer's expense, before his sixty percent was computed, are enough to call for special and unusual formulas. True, the remarkable possibilities of such a contract would not have been so apparent in 1933, but the taxes were evidently not paid by Lux-Witwer until 1939, and even then in such a manner that even the Certified Public Accountant who prepared the statements was not aware of the payment.

"The referee finds that the payment by the Lux-Witwer Company of the income taxes of S. E. Lux, Jr., was not authorized by the contract, and that the evidence did not sustain the defendants' contention that Potts had agreed to their interpretation.

### "FINDING No. 32

"The personal income taxes of Potts, McKnaught and Listz were never paid by or charged to the expense of the Lux-Witwer Company.

### "FINDING No. 33 .

"The amounts of personal income taxes of S. E. Lux, Jr., which were charged to expense in 1941, 1942 and 1943 are admitted in paragraph (8) of his amended answer to be as follows: For the year 1941, $7,261.42; for 1942, $19,852.19 plus $1,253.69; for 1943, $53,137.06 plus $3,609.05, making a total to the end of 1943 of $85,113.41. To this should be added the sum of $12,094.16 which was charged to general expenses in Plaintiffs' Exhibit 1, as 1943 tax paid in 1944, but which is not conceded to be a duplication, and for which defendants have made an additional tender. This makes a total of $97,207.57 charged to expense for 1941, 1942 and 1943 tax, which reduced the profits in which Potts was to share for those years in the percentage of twenty percent, and plaintiffs should therefore recover twenty percent, or $19,441.51."

Following these findings the referee made conclusion of Law No. VI, as follows:

"The written contract did not authorize payment of S. E. Lux, Jr., state or federal income taxes from the funds of Lux-Witwer Company, and it is not shown by competent evidence that Potts agreed to an interpretation authorizing such payment."

The first argument of defendants on this point is that the contract itself by its express terms provided that these taxes should be paid before profits could be divided. The clause of this contract upon which they rely is, as follows:

"The Net Profit mentioned above is to be figured after the regular reserves for Taxes, Depreciation, etc., have been set up."

This argument is not seriously urged by defendants. Indeed it would be so unusual for the words "regular reserves for taxes" to be held to cover such an item as the income taxes of one of the parties that the statement of the proposition would seem to be its best refutation. Besides the best answer to his argument is that the payments were carried under some other head on the books.

The defendants do seriously urge that the annual statements were accounts stated extending over a period of fifteen years and the plaintiff should not be permitted to recover any additional amounts than the amounts found due him based on these statements. Many authorities are cited where it is held that parties cannot go behind accounts stated.

The best answer to this argument is that for the years 1939 and 1940 the personal income taxes of Lux were charged to expense under the head of merchandise purchased. The expert accountant did not know of it when he was making up the accounts. The referee did not find that Potts ever knew such a charge was being made. None of the parties gave any explanation for such a charge. It is difficult to conceive of any reason for carrying on the books in such a manner, except to conceal the fact that it was being made even from the accountant who was making up the annual statements. At any rate, none of the statements set out any income tax item except 1941 when such an item appeared for a special reason for that year. It is the rule that an account stated is only prima facie evidence of its correctness. (See *Clark v. Marbourg*, 33 Kan. 471, 6 Pac. 548; *McCue v. Hope*, 97 Kan. 85, 154 Pac. 216; *Rodgers v. Slavens*, 101 Kan. 4, 668 Pac. 1088; *Swaller v. Milling Co.*, 116 Kan. 329, 226 Pac. 1001; and 1 Am. Jur., pp. 285-287, sec. 30 and 31.

The matter is dealt with as well as anywhere in *Swaller v. Milling Co.*, supra, as follows:

"What are legally sufficient reasons for not permitting an account stated to be final and conclusive? Fraud, of course; but there are other reasons. Error, omission and mistake are also sufficient." (p. 342.)

Here McKnaught, one of the defendants, kept the books. He

caused the payment of the Lux income taxes to be carried on the books under other heads. No fraud is pleaded and none is found but such a practice was to say the least irregular. There is no mystery about the law of accounts stated. It springs from the rule of fair dealing that one cannot take two irreconcilable positions. Here defendants are relying on a finding that they concealed an item on the books so that an expert accountant could not find it and then arguing that Potts was bound by such a statement. We have concluded the argument that the annual statements were accounts stated so that Potts could not go behind them is not good.

Defendants next argue that all the parties interpreted the contract to mean that "taxes used in it meant taxes." How could Potts make such an interpretation when he did not know about the taxes being paid and charged? This argument is not good.

The same answer may be made to the argument that Potts is estopped by the statements from making an additional claim.

Defendants next point out that the 9th conclusion of law ordered judgment for the plaintiff "with interest on said amounts at the rate of six percent per annum from August 31, 1944." The judgment of the trial court included an item for this interest. Defendants argue that this was error because the claim on August 31, 1944, the date when Potts severed his connection, was unliquidated. They argue that interest may not be allowed before judgment on an unliquidated claim except from the time the claim is judicially determined. The statute on interest is G. S. 1935, 41-101. It reads, as follows:

"Creditors shall be allowed to receive interest at the rate of six percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the same and ascertaining the balance; for money received for the use of another, and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their day or monthly employees, from and after the end of each month, unless the same shall be paid within fifteen days thereafter."

There are two provisions of the above section pursuant to which interest might have been allowed in this case. The amounts due plaintiffs were for practical purposes liquidated—all that remained once the question of law was settled was to compute the amount of applying the twenty percent. (See *Smith Bros. v. Hanson*, 106 Kan. 32, 187 Pac. 262; *Emerson v. Indemnity Association*, 112 Kan. 426,

211 Pac. 622; *Young v. Newbold,* 119 Kan. 394, 239 Pac. 1106; also, *Thompson v. Howard Motors Co.,* 122 Kan. 339, 252 Pac. 468.)

The money found to be due plaintiffs was due Potts on September 1, 1944. His widow has been kept from it ever since. If she ever receives any of it, it will be more than four years after it was due and at the end of expensive and vexatious litigation. During all this time defendants have been using plaintiff's money to carry on its business. We have concluded that the trial court did not err in allowing interest to the amount found due plaintiffs.

It follows that the judgment of the trial court is affirmed as to the defendant's appeal.

We go now to the cross-appeal of plaintiffs. The referee found in favor of the plaintiffs on the items that have been discussed and in favor of defendants on many others. None of these items have to do with the first cause of action.

The first of these we shall consider is referred to as the overcharge on rent. The referee dealt with it in Finding No. 23, quoted above.

Their argument amounts to a request that we examine the evidence and reach a different conclusion on the facts. But little would be added to this opinion by detailing the evidence on this point. Suffice it to say that while a different result as to the facts might have been reached by the trier of the facts, there was substantial evidence to sustain the finding and we will not reëxamine it here on appeal.

The same may be said of the next five items argued by plaintiffs. Plaintiffs ask us to go into the accounting action and actually have another accounting on the record. This we never do.

The next item argued by plaintiffs has to do with the third cause of action. In it plaintiffs claimed in their petition that the amount due Potts should be increased because S. E. Lux, Jr., from 1941 on arbitrarily conveyed to S. E. Lux III, his son, ten percent of the annual net profits. The referee dealt with this in Findings 35 and 36. In these he found that the written contract was orally modified by all the parties to permit this. There was substantial evidence to sustain this finding and there is nothing we can do about it.

Plaintiffs argue that the trial court should have made two findings suggested by them as to the profits for 1944 rather than the findings that were made. Again we find that the findings of the trial court were made on substantial evidence and we will not disturb them here.

The next argument of plaintiffs has to do with the relationship of the parties. They point out that the referee based his decision on the item of good will on the sole ground that the arrangement between the parties was not a partnership. Plaintiffs argue that we decided when the appeal was here before that it was a partnership. (See *Potts v. Lux*, 161 Kan. 217, 166 P. 2d 694.) We did not go quite that far. We held the petition stated facts that gave Potts a right to an accounting. When the case was finally tried the referee found on substantial testimony that there was no partnership but a contract of employment with profit sharing features. We find nothing wrong with this conclusion.

Plaintiffs next argue that the trial court erred in admitting the testimony of McKnaught, Listz and Lux as to conversations with Potts. Their point is that this testimony was incompetent because it was of a transaction with a deceased person. In their answers these defendants disclaimed any interest in the outcome of the action. Plaintiffs maintain that these disclaimers were in reality only qualified disclaimers and that McKnaught, Listz and Lux were actually testifying in their own behalf. In the first place, the referee found that since there was a question as to the admissability of the testimony of Lux the findings were not based on his testimony. As to the testimony of McKnaught and Lux, the only qualification of their disclaimer was that they were not forfeiting any right they had under their contract with Lux. That would not affect the interests of Potts. Potts pleaded that they had a share in the contract. Actually they testified against their own interests. In *Collins v. Hayden*, 104 Kan. 351, 179 Pac. 308, we said:

"In a doubtful case this court inclines to an interpretation of a statute that will admit, rather than reject evidence. (*Williams v. Campbell*, 84 Kan. 46, 50, 51, 113 Pac. 800; *Sarbach v. Sarbach*, 86 Kan. 894, 896, 122 Pac. 1052.) In view of the ambiguity noted, we cannot attribute to the legislature a purpose to exclude the testimony of a witness in the class of cases referred to, whenever a decision in favor of the party calling him would inure to his own benefit. It follows that the evidence was rightly admitted."

(See, also, *Bungard v. White*, 132 Kan. 349, 295 Pac. 684.)

Plaintiffs next point out that the referee placed the burden of proof on them and argue that this was error. They argue that since defendants had agreed to share profits with Potts, defendants had the duty of keeping accurate accounts and this carried with it the burden of proof. They argue the rule is in point here because all the

books and records of the company were in their possession. All the books and records of the company were available to plaintiffs. We find no matter upon which they failed to prove because they did not have the books and records.

The judgment of the trial court is as to the appeal affirmed, and as to the cross-appeal is affirmed.

HARVEY, C. J., and PRICE, J., not participating.