The KANSAS POWER & LIGHT COM-
PANY, Appellant,

v.

HUGOTON PRODUCTION COMPANY,
Appellee.

No. 5713.

United States Court of Appeals
Tenth Circuit.

Jan. 28, 1958.

Willard N. Van Slyck, Jr., Topeka, Kan. (Clayton E. Kline, James L. Grimes, Jr., of Doran, Kline, Cosgrove & Russell, Topeka, Kan., with him on the brief), for appellant.

Douglas Gleason, Ottawa, Kan., and G. R. Redding, Indianapolis, Ind. (A. M. Gavit, Indianapolis, Ind., Gleason & Gleason, Ottawa, Kan., and Baker & Daniels, Indianapolis, Ind., with them on the brief), for appellee.

Before BRATTON, Chief Judge, PICKETT, Circuit Judge, and RICE, District Judge.

PICKETT, Circuit Judge.

Hugoton Production Company brought this action to recover alleged underpayments for natural gas delivered to The Kansas Power and Light Company under the terms of an existing contract.[1] The dispute arose over the method of computing the number of British Thermal Units contained in the gas delivered. A British Thermal Unit, generally known as a "BTU", is defined as the amount of heat required to raise the temperature of one pound of water one degree Fahrenheit. In a trial to the court without a jury, judgment was entered for the amount claimed, with interest.

Although there was some additional evidence offered at the trial, the essential facts were stipulated. On October 18, 1948, the parties hereto entered into a contract wherein the Kansas Company agreed to purchase natural gas from Hugoton for resale and for use in its electric power plants. Deliveries under the contract were to begin November 1, 1949 and extend through November 1, 1964. The contract price for the resale gas was 12¢ per thousand cubic feet (MCF), while the price of the gas used for power purposes was fixed at 15¢ per million BTUs, which price was to be adjusted as the price of coal changed. It was agreed that 25% of all gas delivered was to be considered as having been used for power purposes. The unit measurement for all gas was one cubic foot saturated with water vapor at a temperature of 60 degrees Fahrenheit, at an absolute pressure of 14.9 pounds per square inch. This action involves only the payment for the gas used for power purposes.

Pursuant to the provisions of the contract, the Kansas Company installed and maintained meters to measure the volume of gas delivered, and also equipment to compute the number of BTUs in the gas. The Kansas Company prepared and furnished to Hugoton monthly statements showing the volume of gas delivered at a temperature of 60 degrees Fahrenheit at 14.9 pounds of pressure per square inch, and also the information from which the number of BTUs in a cubic foot of gas could be computed. Hugoton, relying upon this information, computed monthly the bills for the gas which were sent to the Kansas Company. In determining the BTU content, the Kansas Company used an adjustable measuring device which was fixed to make a determination upon the basis of an absolute pressure equivalent to that of 30 inches of mercury at 32 degrees Fahrenheit. On each statement the Kansas Company reported that the cubic foot measurement was at an absolute pressure of 14.9 pounds per square inch. It is agreed that a cubic foot of gas, at 60 degrees Fahrenheit, under 14.9 pounds of pressure per square inch, contains 1.0114 times as many BTUs as a like cubic foot under pressure of 30 inches of mercury at 32 degrees Fahrenheit. Hugoton did not learn until November of 1951 that the information statements furnished to it by the Kansas Company used a pressure base for computing the number of BTUs in power gas other than 14.9 pounds per square

1. The parties will be referred to herein as "Hugoton" and "Kansas Company".

inch. Demand for payment was then made for the additional amount of BTUs which had been furnished. The Kansas Company does not deny that it received more BTUs than it paid for, but insists that the computations were made as provided for by the terms of the contract. It relies upon the contractual provision relating to the heating value, which reads:

"The heating value of all gas delivered hereunder shall in no event, at the time and place of delivery, be less than 950 British Thermal Units per cubic foot of gas saturated with water at a temperature of 60° Fahrenheit and an absolute pressure equivalent to that of 30″ of mercury at 32° Fahrenheit."

That the contract required payment by the Kansas Company for all gas consumed in its power plants according to the number of BTUs, appears to us to be too clear for misunderstanding.[2] The provision relating to the heating value has no relation to the price provisions, but merely fixes a minimum of heat in a cubic foot of all delivered gas, whether for resale or that consumed for power. There is no ambiguity in the contract as to the liability of the Kansas Company for the gas consumed in its power plants. It required that company to pay for all gas so consumed according to the BTU content. Clearly the company did not do so.

It is urged that prior to November of 1951 Hugoton accepted the statements as correct and received the payments without protest, therefore they became final and conclusive as an account

stated. The trial court found that Hugoton did not know that the information furnished by the Kansas Company was incorrect and that all of the BTUs supplied were not reflected in the reports. The Kansas Courts have held that under such circumstances the account stated is not conclusive. An account stated is only prima facie evidence of its correctness. Potts v. Lux, 168 Kan. 387, 214 P.2d 277. In Swaller v. Williamson Milling Co., 116 Kan. 329, 226 P. 1001, 1008, the Kansas Supreme Court stated the controlling principles as follows:

"What are legally sufficient reasons for not permitting an account stated to be final and conclusive? Fraud, of course; but there are other reasons. Error, omission, and mistakes are also sufficient. * * *

"Since a creditor who sent to a debtor who did not respond a footed but incorrect account, meaning no more than 'I have you charged with these items totaling so much,' ran great risk of having a jury find an account stated 'from the circumstances,' the practice arose of adding to accounts rendered the words 'errors and omissions excepted.' In this state the law writes those words into an account rendered, together with an exception of mistake, which may be of law or of fact, and on one side only. The result is, so far as correctness is concerned, an account stated is prima facie evidence only. McCue v. Hope, 97 Kan. 85, 154 P. 216, 11 A.L.R. 581. While the agreement implicit in account stated stands, and the account may not be opened except for some cause im-

---

2. The contract provision relating to the price to be paid for gas recites:

"The price to be paid by Kansas Company to Hugoton for all the gas to be delivered hereunder shall be as follows:
* * *
"(b) For volumes of gas sold to Kansas Company for consumption in its power plants connected to its gas transmission system and located wholly within the State of Kansas, the price of Fifteen (15¢) Cents per Million British Thermal

Units, when the price of coal is Five Dollars and Fifty Cents ($5.50) per ton delivered at Kansas Company's Tecumseh Power Plant. It is agreed that the price per million British Thermal Units of the gas utilized in said power plant shall be increased or decreased in the amount of $.0015 per million British Thermal Units for each variation of Five (5¢) Cents per ton increase or decrease in said coal price."

peaching it as an entirety, the correctness of error, omission, or mistake merely effectuates the intention of the parties to balance their accounts."

Shortly after Hugoton learned of the error in the method used in determining the BTUs, it notified the Kansas Company of the same and requested a change in the method of ascertaining the BTU content. At the same time a demand was made for the deficiency existing. There were discussions concerning the matter, and some correspondence. The Kansas Company, however, refused to change its method of computation. In preparing the monthly statements for the amount due, Hugoton computed the actual number of BTUs in the gas, but payment was made by the Kansas Company according to its own computations. The checks and vouchers sent to Hugoton were the same as those which had been regularly used for all prior payments. The remittances were made in exactly the same manner as they had been made prior to the discovery of the error in the computations. In refusing to make the additional payments, the Kansas Company wrote Hugoton explaining their position and stating that "the only manner of measuring these differences in interpretation in our judgment, is through judicial determination. This is not a subject for determination by testing or research laboratories." Each monthly check had printed thereon the following: "By endorsement of this check payee acknowledges payment in full for all items listed on the attached memo." Hugoton cashed these checks and notified the Kansas Company that they were crediting its account with the amount of the check. It is contended that the acceptance of these payments amounted to an accord and satisfaction, which prevents recovery. The trial court found that: "At all times after the plaintiff's discovery, in November, 1951, of the method of computation used by the defendant, until the filing of the complaint in this action, both the plaintiff and the defendant understood that the difference in their methods of computing the amounts payable by the defendant to the plaintiff was being held for future determination." The evidence sustains this finding.

The Kansas rule is that to constitute an accord and satisfaction, the agreement that a smaller sum shall be accepted in discharge of a larger one originally claimed, must have been entered into by the parties understandingly and with unity of purpose. Lighthouse for the Blind v. Miller, 149 Kan. 165, 86 P.2d 508; Vigneron v. List & Hallett Const. Co., 130 Kan. 676, 288 P. 570; Minor v. First National Bank of Herington, 112 Kan. 666, 212 P. 672, and the cases there cited. There is substantial evidence to support the trial court's finding that neither party understood that the acceptance of the payments was to be an accord and satisfaction. See Nevada Half Moon Mining Co. v. Combined Metals Reduction Co., 10 Cir., 176 F.2d 73, certiorari denied 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581; United States v. General Petroleum Corp. of Calif., D.C.S.D.Cal.1947, 73 F.Supp. 225, affirmed, Continental Oil Co. v. U. S., 9 Cir., 184 F.2d 802.

Finally, it is contended that the court erred in allowing interest upon the sums found to be due. These obligations were created by definite contract provisions, and became due on specified dates. The liability of the Kansas Company was absolute, and it had the use of a liquidated amount of money which should have been in the hands of Hugoton after the payment dates. Under such conditions, the Kansas Courts have held that interest is recoverable from the date on which payment was due. Potts v. Lux, supra; Thompson v. W. C. Howard Motors Co., 122 Kan. 339, 252 P. 468; Young v. Newbold, 119 Kan. 394, 239 P. 1106; Smith Bros. & Cooper v. Hanson, 106 Kan. 32, 187 P. 262; G.S.Kan.1949, 16–201. See also Southern Painting Co. of Tenn. v. United States, 10 Cir., 222 F.2d 431.

Affirmed.