Nos. 43,715 and 43,716

Fred Schupbach, Jr., Marjorie A. Schupbach, W. R. Claybaugh, J. H. McClure, G. M. Groendycke, F. W. Schupbach, John Schupbach and Edwin Schupbach, *Appellants* and *Cross-Appellees*, v. Continental Oil Company, a Corporation, *Appellee* and *Cross-Appellant*.

Faye Gilmore, Ruth Chapin, U. B. Harbaugh, Mabel A. Harbaugh, Albert H. Harbaugh, Jim C. Harbaugh, Jacob G. Harbaugh, Betty J. Garten and Mollie M. Watts, *Appellants* and *Cross-Appellees*, v. Continental Oil Company, a Corporation, *Appellee and Cross-Appellant*.

(394 P. 2d 1)

Opinion filed July 14, 1964.

*W. Luke Chapin,* of Medicine Lodge, argued the cause and was on the briefs for appellants and cross-appellees.

*Gerald Sawatzky,* of Wichita, argued the cause, and *Richard R. Linn,* of Oklahoma City, Oklahoma, *Ralph C. Hall,* of Medicine Lodge, and *Stuart R. Carter,* of Wichita, were with him on the briefs for appellee and cross-appellant.

The opinion of the court was delivered by

Fatzer, J.: This was an action for an accounting as to, and recovery of, royalties due the plaintiffs under the gas royalty provision of certain oil and gas leases; to require the defendant, Continental Oil Company, a corporation, to pay into court the gas royalties due plaintiffs, together with interest at 6 percent per annum

on unpaid royalties due, and for distribution of the same in accordance with plaintiffs' respective interests.

The appeals, Nos. 43,715 and 43,716, are companion cases, and the parties are agreed that both appeals present identical questions and that a decision in No. 43,715, *Schupbach v. Continental Oil Co.*, will control and govern No. 43,716, *Gilmore v. Continental Oil Co.* Hence, we treat only the Schupbach case, No. 43,715.

Continental is the assignee of an oil and gas lease obtained in 1946 on the Newkirk section in Barber County containing 620 acres. The plaintiffs are owners of royalty interests under the Newkirk lease.

The principal question presented is whether Continental, the lessee-operator of wells in the Rhodes Field in Barber County which produce oil and gas in combination, may deduct a ⅛th share of its claimed compression cost to market the gas, from the proceeds of gas produced and sold under leases which require the lessee to pay to the lessors "⅛th of the proceeds of the sale thereof at the mouth of the well." Continental claims it is entitled to charge reasonable costs for compressing the gas for market (about seven cents per M. c. f.), and the plaintiffs seek to recover ⅛th of the gross proceeds of the sale of gas after compression when sold and delivered by Continental to Cities Service's natural gas transmission pipeline which crosses the Newkirk lease.

It is unnecessary to summarize the pleadings since the action was tried by the court on a stipulation of facts of the parties, and the court approved Continental's computations for accounting to the plaintiffs upon the basis that, as a matter of law, Continental was entitled to reasonable costs of compressing the gas for market, and it entered judgment approving the accounting on that basis, and ordered that the money paid into the court by Continental represented royalties to the plaintiffs as calculated by a deduction of compression costs incurred by Continental.

In 1949 the Barbara Oil Company first obtained oil and gas production from a Mississippi Chat formation to the north and east of the area here involved. That area was called the Rhodes Field. In August, 1956, Barbara Oil Company began compressing and selling the gas produced from its wells to Cities Service Gas Company at 12 cents per M. c. f., and in computing royalties, Barbara does not deduct compression costs from the royalty owners under its leases.

In 1950 Continental drilled a well southwest of the Rhodes Field and encountered oil production in the Mississippi Chat. The formation was much tighter than the Barbara production to the north and east and was belived to be a separate pool called the Gerlane Pool. Other wells were drilled in the Gerlane area which proved to be noncommercial wells. In 1953 Continental initiated a fracture process which proved to be effective to increase the rate of flow of oil into the well bore. A drilling campaign followed which caused the Rhodes and Gerlane Fields to become joined and the combined field became known as the Rhodes Field.

Since the wells in the Rhodes Field produced oil and gas in combination, the combined stream was required to be run through a "separator" to remove the gas before the oil could be placed in storage tanks. Since gas is lighter than oil, the ratio of gas to oil in the formation increased in the higher portions of the reservoir rock, and more gas was produced from wells in the northeast part of the field.

The area of the Rhodes Field involved in this action is in the lower portion of the field and the wells started production at a low ratio. However, as is typical of formations such as here involved, the ratio of gas to oil increased, so that by February, 1957, when the gas was first compressed and sold by Continental, there was an average of from 40,000 to 50,000 cubic feet of gas produced from each well per day.

The primary revenue from the Rhodes Field is and has been from oil production. Although the sale of gas affords an additional source of revenue to the lessors and the lessees, it is of secondary importance to the revenue received from oil. Continental has several adjoining leases in the area involved, including the Newkirk lease on which there are located 22 oil wells. After the gas and oil are separated, the oil is run into storage tanks on the lease and the gas is run in a combined stream to Continental's compressor station located on the Newkirk lease. Wells on the Newkirk lease as well as other adjoining leases are connected by a pipe line to Continental's compressor where the gas is compressed and sold to Cities Service Gas Company.

Continental's contract with Cities Service provides for purchase by Cities Service of all gas produced in connection with its allowable oil production at 12 cents per M. c. f., with an escalation of one cent per M. c. f. for the period December 23, 1959, to December

23, 1964. The price for each five-year period thereafter is to be determined by negotiation or arbitration. The contract requires Continental to gather its gas at a central point designated in the contract (the compressor site on Section 20—the Newkirk lease) and compress the gas to such pressure as Cities Service requires, but not to exceed 700 pounds per square inch. Deliveries of gas under the contract commenced in February, 1957, and Cities Service accounts to Continental monthly—the 23rd of one month through the 22nd of the next month.

When oil was first sold from the Newkirk lease, the plaintiffs executed a division order for oil only. That order required Continental to account and pay to the plaintiffs or their assigns, ⅛th of the market price paid by the purchaser for the oil delivered, free of cost to the plaintiffs, except that if it became necessary to transport the oil sold by truck, then Continental was authorized to deduct from the price the hauling charges agreed upon and paid by Continental. After Continental commenced selling compressed gas to Cities Service, it requested plaintiffs to execute a division order concerning the sale of the gas, which provided, in part:

"In determining market value at the mouth of the well or the proceeds of sale at the mouth of the well for the purpose of computing the royalty on the sales of such gas, it is agreed that the undersigned royalty owners shall receive their respective proportionate parts of the amount received by lessee from the sale of gas attributable to the production from the lands above described, less the actual cost and expense of gathering, processing, and compressing that part of the gas the proceeds of which are attributed to their respective interests, provided, however, that to and including June 30, 1957, the actual cost and expense of such gathering, processing, and compressing shall be conclusively presumed to be four cents (4¢) per thousand cubic feet; thereafter, for each semi-annual calendar period, the cost and expense to be deducted shall be considered as the actual average cost and expense (including reasonable depreciation on said facilities) of gathering, processing, and compressing (expressed in unit cost per thousand cubic feet of gas) incurred during the preceding semi-annual period."

Plaintiffs refused to sign the proposed division order and Continental did not pay any gas royalties until sometime after this action was filed, when it paid into court the amount of gas royalties it claimed was due the plaintiffs after deduction of claimed gas compression costs.

On February 12, 1960, after considerable correspondence between the attorneys for the parties, Continental offered by letter as follows:

"As you no doubt know, we have worked out an arrangement with Messrs. MacGregor, Coss & MacGregor for their client, Mrs. Newkirk, whereby we

released the amount in suspense and paid to Mrs. Newkirk the gas royalty on her interest as we compute it (i. e., less compression costs) as it accrued. This was done with the express understanding that Mrs. Newkirk was surrendering none of her rights to litigate her contention that we lacked authority or right to deduct the compression costs. If you desire, I am sure that similar arrangements can be made for each of your clients if you will but advise us as to their identity and the respective interests claimed by each."

The plaintiffs did not respond to the offer and thereafter commenced this action.

When Continental paid into court the amount of gas royalties it claimed was due the plaintiffs, it filed Exhibit A which was a detailed computation of all gas produced from the Continental leases in the area and compressed through its compressor station. No detailed summarization of that exhibit is here necessary other than to say that the total sale of gas and condensate gasoline from the Newkirk lease for the period involved was $232,556.04 and that as against such sale, total compression costs claimed by Continental was $108,147.72. In view of conclusions hereafter announced it is unnecessary to detail district office expense and amortization charged by Continental, but it is sufficient to say Continental claimed such expense as compression costs and that the plaintiffs denied their validity.

The question of Continental's right to deduct compression costs from the proceeds of the sale of gas was settled by this court in *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P. 2d 602, where it was held:

"2. Construction of oil and gas leases containing ambiguities is in favor of the lessor and against the lessee for the reason that the lessee usually provides the lease form or dictates the terms thereof and if such lessee is desirous of more complete coverage, the lessee has the opportunity to protect itself by the manner in which it draws the lease.

"3. Under the facts and circumstances of this case the lessee, following the authorities cited in the opinion, has the duty of making the gas marketable and cannot recover from the lessors for the expense of installing a compressing station used to compress all gas produced on the leases because such installation was a necessary expense in the process of making such gas marketable.

"4. Where a lessee, as here, in extracting oil from the ground also extracts gas and in order to carry out its duty to find a market for such gas and prevent the waste thereof, separates the oil from the gas and compresses the gas to make it marketable, when such gas is sold the lessee has title and possession thereof as its personal property and under the terms of the leases here being considered, it is required to pay one-eighth of the gross proceeds to the lessors." (Syl. ¶¶ 2, 3, 4.)

We have carefully considered the authorities cited by Continental and the argument advanced by which it attempts to distinguish the Gilmore case, but we see no real distinction between the two cases and conclude that the decision in the Gilmore case is controlling. The compression and sale of gas is from the same field (Rhodes) and the Newkirk lease adjoins the Superior leases there involved; the form used for the Newkirk lease and all other lease forms used by Continental in the area, are identical in language with the lease forms used in the Gilmore case; as in Gilmore, the gas and oil was separated at centrally located separators on the leases in question and the gas was transported to a central compressor station where it was compressed and sold; Continental, like Superior, constructed its compressor station at a central location on one of its leases and commenced compressing the gas from its adjoining leases in the area without consulting the lessors and royalty owners as to the location of the compressor station or as to the size or number of stations or as to any intention on its part to charge compression costs to the royalty owners, and the fact that the compressor station was constructed under a business lease on the Newkirk section is of little consequence. In addition, Continental has made a substantial net profit from its gas compression operations just as Superior did even though Continental's claimed compression costs are considerably higher than were Superior's.

The only discernible difference between the two cases lies in the fact that the instant case was tried and judgment rendered on a stipulation of facts, while the Gilmore case came before this court on an order sustaining Superior's demurrer to the plaintiffs' petitions. We deem it unnecessary to further extend this opinion on this point and refer the reader to *Gilmore v. Superior Oil Co.*, supra, and the authorities cited therein, and conclude that, under the facts and circumstances here present, the district court erred in its conclusion of law that Continental was entitled to deduct reasonable costs of compression from gross proceeds in computing gas royalties to be paid to the plaintiffs.

The plaintiffs contend the district court erred in striking paragraph 14 of their amended petition containing allegations why the action should have been prosecuted as a class action. When the action was originally filed, Fred Schupbach was the only plaintiff and he filed the action "in behalf of himself and in behalf of all owners of royalty interests in and under, and in oil and gas pro-

duced from the above described property and premises (the New-kirk lease)." Paragraph 14 alleged that there were 23 other royalty owners under the Newkirk lease; that plaintiff did not know how many, if any, of such royalty owners signed the division order providing for a deduction of compression costs from gross proceeds in computing royalty; that such division order, if entered into, was not valid, and alleged generally that the action should be permitted as a class action. After the court sustained the motion to strike the paragraph, seven other royalty owners joined in the action as plaintiffs but others did not, including Mary Newkirk, trustee, who was the owner of ½ of the royalty. The plaintiffs state in their brief that if recovery of gross proceeds is permitted, they will receive only sixteen percent of the benefits from securing a determination in their favor, while the other royalty owners who have not signed the division order and who were not parties to the action, will automatically receive 84 percent of the benefits of the time and effort expended by the plaintiffs, and that a class action should be permitted to be maintained.

In making the contention, the plaintiffs refer to G. S. 1949, 60-413 which provides that class action may be maintained under certain circumstances; to general authorities (39 Am. Jur., Parties, § 44; 14 Am. Jur., Courts, §§ 74, 75 and 171) dealing with parties to actions, the inherent powers of courts of equity, and the duty of a court of equity when a common fund is created or preserved for benefit of others, and to *Sprague v. Toconic Bank,* 307 U. S. 161, 83 L. Ed. 1184, 59 S. Ct. 777 and *Warren v. Palmer,* 310 U. S. 132, 84 L. Ed. 1118, 60 S. Ct. 865, to the effect that the power of courts of equity to make an allowance for counsel fees and other expenses of litigation not included in taxable costs, is not limited to cases where the plaintiff purported to sue for a class for a common interest, or has recovered a fund in which others share, but extends to a case in which a plaintiff, in establishing his own right, has likewise established through the principle of *stare decisis,* a like right in others.

We think the court did not err in striking paragraph 14. The issue involved was whether Continental was entitled to deduct reasonable costs of compression from gross proceeds of the sale of gas and not whether the plaintiffs and their counsel were entitled to expenses of litigation not taxable as costs.

Conclusions heretofore announced require a reversal of this case,

which will produce a substantial fund to be distributed to the plaintiffs and other lessors and royalty owners of the leases involved. We do not pass upon the question whether the plaintiffs and their counsel would be entitled to an allowance of expenses of litigation from the fund created and to be distributed under the direction of the court. That is a question to be determined in another action.

The plaintiffs lastly contend the district court erred in denying their claim for statutory interest on unpaid royalties. (G. S. 1949, 16-201.) We agree. When the gas was separated from the oil on the various leases, it became the sole property of Continental which sold it to Cities Service at the price fixed in the contract. There was an established market price for the gas, which Cities Service paid monthly, and the royalties due plaintiffs could have been ascertained by Continental with definite certainty. Interest at the rate of 6 percent per annum should be allowed on royalties due the plaintiffs from the month following the date payment was made by Cities Service to Continental, as hereafter noted. (G. S. 1949, 16-201; *Phillips Petroleum Co. v. Williams,* 158 F. 2d 723; *Kansas Power & Light Co. v. Hugoton Production Co.,* 251 F. 2d 946.) On February 12, 1960, Continental tendered the amount of royalties it then calculated to be due the plaintiffs, which they rejected, and the district court should compute interest on that amount only to February 12, 1960, and subsequent royalty accruals based upon the formula of the tender should not bear interest. The question whether Continental could deduct compression costs for marketing the gas had not then been determined, and there is authority that the debtor may properly accompany the tender with a declaration that it is without prejudice either to the debtor's contention that no more is due, or to the creditor's claim that an acceptance does not amount to an admission that the tender covers the entire debt. (47 C. J. S., Interest, § 52, p. 65.) However, with respect to the amount of royalties withheld by Continental as claimed compression costs, the district court should direct Continental to compute and pay into court as a part of that fund, interest thereon as heretofore directed until the date of payment.

Continental's cross-appeal concerns the propriety of the district court's judgment disallowing in major portion its claimed "district office expense" as an item of claimed compression costs. Since Continental is not entitled to deduct any claimed compression costs from gross proceeds of the sale of gas, it is immaterial whether the

district court's judgment was in error, and all sums allowed Continental in its judgment for compression costs are directed to be set aside.

In view of conclusions heretofore announced, the judgment of the district court is reversed with direction to enter judgment for the plaintiffs in accordance with the views expressed in this opinion.

FONTRON, J., concurring: I find it extremely difficult to accept the rationale of *Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P. 2d 602. It offends my sense of logic to say that the market value of gas at the mouth of the well is the price for which the gas is ultimately sold after having been so processed that it has become marketable. I would consider that market value of gas at the well would be that amount for which it could be sold, after deducting such reasonable expense as was required to render it saleable.

However, I recognize that the point has been decided otherwise by this court, and for such reason will concur in the result reached in this case.