No. 120,611

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

L. RUTH FAWCETT TRUST, CINDY K. PAGE-COLMER, TRUSTEE,
on Behalf of Itself and All Others Similarly Situated,
*Appellants/Cross-appellees*,

v.

OIL PRODUCERS, INC. OF KANSAS,
*Appellee/Cross-appellant*.

SYLLABUS BY THE COURT

1.

The mandate rule directs that after an appellate court has remanded a case to a lower court, the lower court must follow the decision that the appellate court has made in the case, unless new evidence or an intervening change in the law dictates a different result.

2.

The mandate rule is an application of the law-of-the-case doctrine to courts. A district court is bound by the decree as the law of the case and must carry it into execution according to the mandate.

3.

In Kansas, on remand, a district court must implement both the letter and spirit of the mandate.

1

4.

Where a mandate merely reverses a ruling of the district court and remands the case for further proceedings but does not direct the judgment of the district court, the district court has discretion to preside over the remaining trial proceedings.

5.

The mandate rule prevents the district court from acting in any way contrary on remand when an issue has been finally settled by earlier proceedings in the case. The mandate rule does not, however, prevent a district court from doing whatever else is necessary to dispose of a case. This means the district court must not only do as the mandate directs but the court must also take whatever steps are needed to settle any other outstanding issues in the case that were untouched by appellate proceedings.

6.

When an appellate court has decided a particular issue, by explicit language or by necessary implication, the district court is foreclosed from reconsidering the issue.

7.

Appellate courts use a three-step test to determine whether a mandate has foreclosed further inquiry into a subject by necessary implication: (1) The issue necessarily had to have been considered in the prior appeal in order to reach a decision; (2) consideration of the issue on remand would abrogate the appellate court's decision; or (3) the issue is so closely related to an issue explicitly resolved by the appellate court that no additional consideration is necessary.

8.

The more specific statute, K.S.A. 55-1615, as opposed to the more general statute, K.S.A. 16-201, controls the computation of prejudgment interest under the facts of this case.

9.

A party can be equitably estopped from asserting the statute of limitations as a defense to a claim, when a party conceals the facts giving rise to the claim.

10.

A party seeking equitable estoppel must show: (1) The other party, by acts, representations, admissions, or silence when that other party had a duty to speak, induced the party asserting estoppel to believe certain facts existed; (2) it reasonably relied and acted on such belief; and (3) it would now be prejudiced if the other party were permitted to deny the existence of such facts.

11.

A party invoking equitable estoppel need not show actual fraud, bad faith, or an attempt to mislead or deceive, but must show both misrepresentation and detrimental reliance.

12.

In order to induce a court to apply the doctrine of estoppel to bar a statute of limitations defense, a plaintiff must prove an element of deception by the defendant on which the plaintiff acted in good faith and to the plaintiff's prejudice. Because of this deception, the plaintiff failed to file its lawsuit within the statutory period.

13.

Equitable estoppel is unavailable to one who has suffered loss solely because of their own acts or omissions. Equity aids the vigilant and not those who slumber on their rights.

Appeal from Seward District Court; LINDA P. GILMORE, judge. Opinion filed October 2, 2020. Affirmed and cross-appeal denied.

3

*Rex A. Sharp*, *Barbara C. Frankland*, and *Ryan C. Hudson*, of Rex A. Sharp, P.A., of Prairie Village, for appellants/cross-appellees.

*Robert W. Coykendall* and *Will B. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellee/cross-appellant.

Before BUSER, P.J., HILL and WARNER, JJ.

HILL, J.: At times a district court's discretion evaporates. When a higher court remands a case to a lower court for further proceedings, the higher court's mandate limits what a lower court can do with that remanded case. The lower court cannot do as it wishes once the case returns. It must follow the ruling of the higher court. This is known as the mandate rule. Because the district court here on remand had to obey the mandate of the Supreme Court, its discretion had disappeared.

After this class action lawsuit returned to the district court on remand from our Supreme Court, the Class sought to amend its petition. The lower court held that it was constrained by the Supreme Court's ruling and refused to grant the motion to amend the Class' claim. The Class appeals.

The district court was correct. Because of what our Supreme Court ruled and how it came to that holding, we hold that granting the motion to amend would have undermined the Supreme Court's judgment and was thus barred by the mandate rule. Simply put, the district court had no discretion to grant the motion.

Additionally, we must resolve an issue over what is the proper prejudgment interest rate on unpaid royalties, and a cross-appeal about whether the Defendants can raise a statute of limitations defense.

4

*The case history provides a context for our decision.*

This class action seeks recovery of underpaid gas royalties. It is brought by about 2,300 royalty owners against the operator, Oil Producers, Inc. of Kansas, known as OPIK in this litigation. OPIK sells the raw natural gas at the wellhead to third parties, who, in turn, make the gas fit to enter our nation's interstate pipeline system. OPIK calculates the royalty payments on the amount it receives for the gas at the wellhead, rather than the price of the gas as it enters the interstate market.

The interstate market standards for the quality of natural gas must be met before gas can enter the pipelines. This often means that the raw gas must be improved by gathering, compressing, dehydrating, treating, and processing the gas once it has been extracted. Naturally, these steps require money. This added cost of processing is why the price for natural gas, as it enters the interstate market, is higher than the price at the wellhead. And that price differential is the main source of the disagreement between the Class and OPIK.

The Class' original petition alleged that OPIK breached its implied duty to market the gas. That duty has been imposed by our courts on the operators of oil and gas leases and not on the royalty owners. In fact, the courts have held that an operator must prepare the gas for market and if it is unmerchantable in its natural form, preparing the gas must be done with no cost to the royalty owner. The Class claimed damages from OPIK for the breach of this duty.

When it first considered this implied duty, the district court granted summary judgment to the Class and denied summary judgment to OPIK. The Class had maintained that by computing its royalty payments on the wellhead price of the gas, instead of the price of the gas as it enters the interstate market, OPIK had, at least partially if not totally, shifted the costs of preparing the gas to the royalty owners. This shifting of the costs of

improving the gas breached the implied covenant to produce. Both sides appealed and the case eventually arrived in our Supreme Court.

The Kansas Supreme Court held that the gas production was merchantable once the operator has put it into a condition acceptable to a purchaser in a good-faith transaction. In reversing the district court, the Supreme Court ruled that the Class was not entitled to judgment as a matter of law. The court rejected the Class' theory that postproduction, postsale expenses necessary to transform raw natural gas into the quality required for interstate pipeline transmission were attributable solely to the operator as part of the operator's responsibility to make the gas marketable. *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, Syl., 365-66, 352 P.3d 1032 (2015).

On a separate issue, the Supreme Court ruled the Class was entitled to summary judgment for OPIK's wrongful deduction of conservation fees from the royalties paid to the Class. The court then remanded the case to the district court. *Fawcett*, 302 Kan. at 352, 366.

Back in district court, the Class sought to amend its claim. This time, the Class alleged that OPIK had violated its duty of good faith and fair dealing by manufacturing a sale *before* the raw gas was in a condition acceptable for the commercial market to shift midstream expenses to royalty owners. The district court denied the motion to amend after finding it was foreclosed from reconsidering the issue of good faith by the Supreme Court's decision and mandate.

The district court also ruled that OPIK could not assert a statute of limitations defense on its illegal deduction of conservation fees. But the district court declined to award prejudgment interest to the Class for OPIK's wrongful deduction of conservation fees. Both parties appeal.

6

The Class contends two errors compel reversal of the district court:

(1) The district court misconstrued the Supreme Court's decision and mandate;

(2) the district court erred by failing to award prejudgment interest.

In a cross-appeal, OPIK claims the district court erred by ruling it was barred by equitable estoppel from asserting a statute of limitations defense for unpaid royalties because of its wrongful withholding of the conservation fee.

The parties pull us in opposite directions on applying the mandate rule. The Class argues that the district court misconstrued the Supreme Court's mandate. Citing the court's statement that "What it means to be 'marketable' remains an open question," it argues the district court should have considered whether the gas was marketable at the well as an open question of fact. *Fawcett*, 302 Kan. at 363.

Bolstering its argument on that point, the Class claims it has expert reports showing the gas was not marketable at the well. The Class suggests the duty to market requires an arm's length sale in an open market with many willing buyers and many willing sellers. It wants a trial where the parties can argue whether a good-faith sale occurred in this case.

The Class also contends the Supreme Court did not say what constitutes a good-faith sale or where a sale must occur for it to be in good faith. The Class maintains that there can be no good-faith sale until after the midstream services to prepare the gas for the downstream market were completed. In its view, an amended petition was appropriate because the Kansas Supreme Court decision changed the law on what it means for gas to be marketable.

Opposing all of these contentions, OPIK argues the proposed amendment to the petition would violate the Supreme Court's mandate. It relies on the court's statement that "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead." *Fawcett*, 302 Kan. at 365. In OPIK's view, the Class is simply relabeling the argument the Kansas Supreme Court rejected. For support on this point, OPIK cites *Edwards v. State*, 31 Kan. App. 2d 778, Syl. ¶ 3, 73 P.3d 772 (2003), where this court stated, "Where the appellate court has decided a particular issue, by explicit language or by necessary implication, the district court is foreclosed from reconsidering such an issue."

In its view, a finding of good faith was necessarily made by the Kansas Supreme Court and considering the Class' argument would undermine the court's explicit holding. OPIK acknowledges that the Kansas Supreme Court said, "What it means to be 'marketable' remains an open question." *Fawcett*, 302 Kan. at 363. But it notes that the court then said: "But the answer is not simply, as Fawcett would have us hold, interstate pipeline quality standards or downstream index prices," 302 Kan. at 363-64, which is what the Class is again arguing in its motion to amend. Simply put, the Class is trying to raise an argument in the lower court that the Supreme Court has already rejected.

*How we will proceed.*

We will first review one form of the law-of-the-case doctrine known as the mandate rule. We explore what lower courts can and cannot do when they, on remand, receive a ruling from a higher court. After that, we will examine the Supreme Court's opinion in this case. To make our ruling, we need to know not only what the court said, but try to determine why it said it. With that in mind, we intend to apply the mandate rule to the Class' motion to amend its claim. At this point, we will determine whether the district court erred in denying the Class' motion to amend.

8

From the amendment motion, we turn to prejudgment interest. First, we will determine which interest rate, if any, applies. And finally, we review the district court's holding that some prejudgment interest is not allowable here because the amount of the unpaid royalty was unliquidated.

At the end, we focus on the cross-appeal. We must decide whether the doctrine of equitable estoppel prevents OPIK from raising a statute of limitations defense.

*The mandate rule*

This rule demonstrates how our courts work when a higher court sends a case back to a lower court. First, we will examine some general authorities on the rule and then look at some Kansas cases. We begin with a dictionary definition.

Black's Law Dictionary 1150 (11th ed. 2019) defines the mandate rule as: "The doctrine that, after an appellate court has remanded a case to a lower court, the lower court must follow the decision that the appellate court has made in the case, unless new evidence or an intervening change in the law dictates a different result." Said another way, the higher court's holding and view of the law controls over that of the lower court.

This rule shows how the law-of-the-case doctrine applies to courts. A district court "is bound by the decree as the law of the case, and must carry it into execution according to the mandate." *In re Sanford Fork & Tool*, 160 U.S. 247, 255, 16 S. Ct. 291, 40 L. Ed. 414 (1895). This statement helps us later when we apply the rule to the facts here.

When we interpret rules like the mandate rule, it is important for us to consider the reasons for the rule. We hold there are two reasons: finality of judgments and the hierarchy of our system of justice. In his comprehensive treatise, Bryan Garner's *The Law of Judicial Precedent*, p. 459 (2016 ed.), he explains:

9

"The mandate rule derives from the structure of the court system. For appellate review to be meaningful, the decision of the appellate court must bind the lower court on remand. Even if the appellate court may be incorrect, finality and the structure of the system require adherence to its decisions."

Without such a rule, litigation would never end. The parties could, on remand to a lower court, try to amend their claims to allege new theories to avoid the application of an unfavorable holding by an appellate court. This would create an unworkable cycle of claims, appeal, remand, amendment, and appeal with no end to the litigation. All of these principles of judgment finality are reflected in Kansas law.

In Kansas, on remand, a district court "must implement both the letter and spirit of the mandate." *State v. Collier*, 263 Kan. 629, Syl. ¶ 4, 952 P.2d 1326 (1998). Indeed, the wording of the mandate is important.

On this point, an informative case is *Edwards v. State*, 31 Kan. App. 2d 778, Syl. ¶¶ 1-2, 73 P.3d 772 (2003). The *Edwards* court applied the mandate rule and held that, where a mandate merely reverses a ruling of the district court and remands the case for further proceedings but does not direct the judgment of the district court, the district court has discretion to preside over the remaining trial proceedings.

This means the mandate rule prevents the district court from acting in any way contrary on remand when an issue has been finally settled by earlier proceedings in the case. The mandate rule does not, however, prevent a district court from doing whatever else is necessary to dispose of a case. This means the district court must not only do as the mandate directs, but the court must also take whatever steps are needed to settle any other outstanding issues in the case that were untouched by appellate proceedings. *State v. Soto*, 310 Kan. 242, 256, 445 P.3d 1161 (2019). But this is a limited freedom for a

10

district court. When an appellate court has decided a particular issue, by explicit language *or by necessary implication*, the district court is foreclosed from reconsidering the issue.

To determine what a "necessary implication" is requires careful analysis. Towards this end, the *Edwards* court used a three-step test to determine whether a mandate has foreclosed further inquiry into a subject by necessary implication:

> (1) The issue necessarily had to have been considered in the prior appeal to reach a decision;
>
> (2) consideration of the issue on remand would abrogate the appellate court's decision; or
>
> (3) the issue is so closely related to an issue explicitly resolved by the appellate court that no additional consideration is necessary.

*Edwards*, 31 Kan. App. 2d 778, Syl. ¶ 4.

We will use this test later to determine if the mandate rule shuts the door to the Class' attempt to amend its petition. But first, we will look closely at the Supreme Court's opinion.

*We examine the Supreme Court's ruling.*

The essence of the Supreme Court's holding in *Fawcett* is found in its syllabus. Three aspects of the ruling are manifest. First, the court addresses OPIK's duty to market:

> "The lessee-operator of the oil and gas leases at issue in this case has an implied duty to market the minerals produced. To satisfy this duty, the operator must market its production at reasonable terms within a reasonable time following production. It must also prepare the raw production, if unmerchantable in its natural form, free of cost to the royalty owners." 302 Kan. 350, Syl.

11

The court not only repeated the duty to market, but then explains what OPIK had to do to comply with that duty.

Next, the court defines what gas produced in Kansas is merchantable:

> "The production is merchantable once the operator has put it into a condition acceptable to a purchaser in a good faith transaction." 302 Kan. 350, Syl.

Thus, in making this rule for natural gas sales, the court calls to mind the traditional roles of willing buyers, willing sellers, and good-faith transactions.

Finally, the court reverses the summary judgment granted by the district court to the Class and explains why it is not entitled to that judgment:

> "Royalty owners in this case were not entitled to judgment as a matter of law on their theory that post-production, post-sale expenses necessary to transform raw natural gas into the quality required for interstate pipeline transmission were attributable solely to the operator as part of the operator's responsibility to make the gas marketable." 302 Kan. 350, Syl.

This is a clear rejection of the Class' claim that OPIK was legally obliged to pay royalties based on the price of gas when it enters the interstate pipeline system.

In its opinion, the Supreme Court explained its reasoning. The court acknowledged that under Kansas law, OPIK has an implied duty to market the gas produced and the law required OPIK to make the gas marketable at its own expense. 302 Kan. at 351-52.

But the court left open what is meant by the term marketable. "What it means to be 'marketable' remains an open question. But the answer is not simply, as Fawcett would

12

have us hold, interstate pipeline quality standards or downstream index prices." 302 Kan. at 363-64. The court expressly ruled the gas *was* marketable here once it was in a condition acceptable to a purchaser in a good-faith transaction. 302 Kan. 350, Syl.

This means that the market defines what is marketable under these circumstances. Because OPIK sold the raw gas in its natural form to third-party purchasers at the wellhead, "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead." 302 Kan. at 365. The court held that the leases did "not impose on the operator as a matter of law the responsibility to perform the post-production, post-sale gathering, compressing, dehydrating, treating, or processing that may be necessary to convert the gas sold at the wellhead into gas capable of transmission into interstate pipelines." 302 Kan. at 352.

The court said if the issue was whether the negotiated sales price for the gas was adequate, the answer would require "a fact-based analysis to determine whether the operator entered into good faith sales and whether the terms of those sales were reasonable under the circumstances." 302 Kan. at 360. After all, an operator must market the gas at reasonable terms within a reasonable time. 302 Kan. at 361, 366.

But that is not an issue here because the Class had contended something else—that "marketable condition" equated only to gas of interstate pipeline quality—and the Supreme Court disagreed. 302 Kan. at 361. It held that the royalty owners "were not entitled to judgment as a matter of law on their theory that post-production, post-sale expenses necessary to transform raw natural gas into the quality required for interstate pipeline transmission were attributable solely to the operator as part of the operator's responsibility to make the gas marketable." 302 Kan. 350, Syl. Only if the gas is unmarketable in its natural form must the operator, at its expense, prepare the gas for market. 302 Kan. at 361.

13

Finally, on this point, the court explained why it ruled as it did: "Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms. Accordingly, we need not dwell further on what this might entail." 302 Kan. at 366.

Essentially, the Supreme Court's ruling is, because the Class did not challenge whether the contracts for purchase of the gas at the wellhead were made in good faith, the only question was whether the gas was marketable at that point in the process. The district court erred in granting summary judgment to the Class by holding that the law required the operator to make the gas ready for the interstate pipelines to be marketable. Instead, the gas is marketable when it is in a condition acceptable to a good-faith purchaser in a good-faith transaction.

*We apply the mandate rule.*

Interpretation of a mandate by an appellate court and the determination whether the district court complied with the mandate involve questions of law over which this court has unlimited review. *Edwards*, 31 Kan. App. 2d 778, Syl. ¶ 1.

In our view, the Class' contention—that a good-faith sale of gas cannot occur at the wellhead—is foreclosed by the Supreme Court's mandate by necessary implication.

The court did note that the precise quality or condition at which gas becomes marketable "remains an open question," but then it answered the marketability question for this set of facts. *Fawcett*, 302 Kan. at 363-64. The court held that gas *is* at least marketable when it is sold in a good-faith transaction. 302 Kan. at 365.

In analyzing that precise decision, this court recently explained, "*Fawcett* didn't say that gas is marketable *only* when it is sold; it said that a good-faith sale satisfies the

14

marketable-condition rule because gas that has been marketed is always marketable. In other words, a sale is sufficient but not necessary for gas to be in a marketable condition." *Cooper Clark Foundation v. Oxy USA*, 58 Kan. App. 2d 335, 344, 469 P.3d 1266 (2020). And, importantly, the *Fawcett* court held that marketability was *not* simply interstate pipeline quality standards or downstream index prices, which is what the Class' good-faith argument reflects in this appeal. 302 Kan. at 363-64.

It is true that the Supreme Court left open the question of what constitutes a good-faith sale. But one definition could hardly cover every conceivable set of facts. In Kansas, every contract implies a duty of good faith and fair dealing—a question of fact. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 965, 298 P.3d 250 (2013). While the duty of good faith is distinct from the marketable-condition rule according to *Cooper Clark Foundation*, 58 Kan. App. 2d at 344, the good-faith requirement does protect royalty owners from sham sales. *Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at \*4 (D. Kan. 2016) (unpublished opinion).

But here, the Class is making the same argument it did in the prior appeal. It is just dressing up the same argument in different clothes. The only difference is now the Class is saying it is an issue of fact rather than an issue of law. The Class contends that good faith means the operator cannot ever sell the gas at the wellhead.

*Fawcett* shows us that, in Kansas, a good-faith sale to a wellhead buyer of gas that then provides midstream services to make the gas ready for our interstate pipelines must be possible, or *Fawcett* would not have been decided the way it was. To rule for the Class on this question would abrogate the Supreme Court's decision.

We share the view of other courts about the *Fawcett* holding. A federal district court blocked experts from testifying that gas cannot be marketed in a good-faith

15

transaction until it meets certain qualitative standards that can never be met at the wellhead. In doing so, the court relied on *Fawcett* to make its ruling:

> "It is clear to the Court that Roco's experts simply disagree with the *Fawcett* decision.
>
> . . . .
>
> "To accept the expert opinions in this case would be to accept the proposition that no third-party purchase agreements made before gathering and processing could ever be made in good faith. While the Kansas Supreme Court did indeed leave open what circumstances would constitute a breach of good faith, it did not contemplate that *all* wellhead or midstream sales agreements would violate the implied duties." *Roco, Inc. v. EOG Resources, Inc.*, No. 14-1065-JAR-TJJ, 2016 WL 6610896, at \*11 (D. Kan. 2016) (unpublished opinion).

The court continued:

> "Roco's argument turns the holding of *Fawcett* into a circular analysis: the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction, but it can only be a good faith transaction if it is marketable. Accepting Roco's argument would also write out of *Fawcett* its rejection of the claim that the gas must be in a certain physical condition to be sold in the commercial marketplace." 2016 WL 6610896, at \*17.

And the Supreme Court went beyond merely saying the Class could not win. The court held that "OPIK satisfied its duty to market the gas when the gas was sold at the wellhead." *Fawcett*, 302 Kan. at 365. In doing so, the court noted that the Class had not argued good faith in this case.

When we apply the mandate rule here, we must affirm the district court. The three questions are thus answered:

16

1) The question of good faith—and in particular, whether a good-faith sale can ever occur at the wellhead—necessarily had to have been considered and relied upon by the Supreme Court because of the stipulation made by the Class;

(2) consideration of the issue of good faith on remand by simply calling it an issue of fact would abrogate the Supreme Court's decision; and

(3) the issue of good faith is so closely related to an issue explicitly resolved by the Supreme Court, that the wellhead sales of gas by OPIK satisfies the marketable-condition rule, then no more consideration of the issue is necessary.

See *Edwards*, 31 Kan. App. 2d 778, Syl. ¶ 4.

The mandate rule indeed shuts the door on this issue. We affirm the district court on this point.

*Prejudgment interest*

The Supreme Court affirmed the Class' judgment for wrongful deduction of conservation fees from the royalties. The parties have stipulated to the principal amount of underpayment because of the conservation fee deductions. They have agreed to $49,000 as the total amount of additional royalties owed within the statute of limitations and to another $49,000 withheld beyond the statute of limitations. They also stipulated that neither party would rely on expert testimony.

The Class moved for partial summary judgment on the applicable prejudgment interest rate statute. The Class argued that the fixed 10 percent rate in K.S.A. 16-201 applied; OPIK argued the lower variable interest rate in K.S.A. 55-1614(h) and K.S.A. 55-1615 applied. The district court ruled that K.S.A. 55-1615, as the more specific statute, was the applicable prejudgment interest statute, rather than the general prejudgment interest provision of K.S.A. 16-201.

17

"The court rejects Plaintiff's position that K.S.A. 55-1615 pertains only to the subject of interest on suspense payments, and not to interest on underpaid royalty. A plain reading of the statute does not distinguish between suspended, delayed or timely but underpaid royalty payments. The court finds the improper deduction of conservation fees is a wrongfully withheld payment and K.S.A. 55-1615 applies."

The district court also ruled that the amount was not liquidated until the parties agreed on the amount and submitted it as a stipulation in the pretrial order. Thus, the court declined to award prejudgment interest.

To us, the Class argues that K.S.A. 16-201 applies to cases in which payment is made in an amount less than the amount due such as this one where OPIK underpaid royalties by deducting conservation fees. But K.S.A. 55-1615 applies to cases in which the amount of a payment is uncontested, but the payment is untimely. The Class argues the "plain language of the statutes demonstrates this difference" and that the legislative history also shows that K.S.A. 55-1615 is limited to suspended royalty payments. The Class argues application of the lower interest rate allows OPIK to profit from its unlawful deduction of conservation fees. The Class also argues the amounts were liquidated because OPIK deducted exact amounts of the conservation fee to calculate the royalty fee and that K.S.A. 16-201 applies no matter if the damages are liquidated.

OPIK argues what statute applies is irrelevant. It argues the district court did not abuse its discretion by declining to award prejudgment interest where the stipulated amount of conservation fees due reflected a rough approximation and negotiation, because the actual amount was incapable of calculation with any degree of accuracy. OPIK alternatively argues that the district court correctly determined that K.S.A. 55-1615 applied.

This presents a question of law over which we exercise unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

18

The district court did not err in determining that K.S.A. 55-1615 was the applicable prejudgment interest statute. The Class reads language into the statute that is not there. K.S.A. 55-1615 lacks language limiting it to suspended royalty payments, as the Class contends. Instead, the statute applies to "any payment." And a "payment" means "the sum to be paid to a payee by a payor arising from payee's interest in a first sale of oil or gas." K.S.A. 55-1614(b). Because the plain language of the statute is unambiguous, we need not consider its legislative history.

We will examine both laws. We start with the general statute on interest on unpaid sums:

"Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter." K.S.A. 16-201.

This law presents a simple method of computing interest: ten percent a year until fully paid.

We turn now to the more specific law. The interest provision in a section of the oil and gas chapter titled "Interest on Proceeds from Production" establishes a complex methodology for the computation of interest on payments due:

"The payor shall owe its payee interest on any payment, other than excluded payments, at the interest rate provided herein, determined on the first business day of the

19

month that interest commences to accrue for that payment. For each subsequent month, the payor shall owe its payee interest on the unpaid balance due payee on the last day of the month preceding such subsequent month at the interest rate provided herein determined on the first business day of each such subsequent month. Interest shall commence to accrue 60 days following the last calendar day of the month of first sale and shall cease to accrue upon the day that payor places the payment in the United States mail, postage prepaid and addressed to payee. In the event a payor pays a payee's payment or portion thereof to a state under applicable unclaimed, abandoned or escheat property laws, then payor's obligation to pay interest on the portion paid over to the state shall cease upon the day that such state receives the payment from payor. Notwithstanding the above, interest shall not commence on oil or gas sales occurring during the first 60 days following the initial sale provided payment is placed in the United States mail, postage prepaid, and addressed to payee, within 120 days following the last calendar day of the month of the initial sale." K.S.A. 55-1615.

This method of monthly variable interest computation is not easy and requires specific information about dates and different interest rates.

In our view, the more specific statute controls. Several federal district courts have come to the same conclusion. See *Hitch Enterprises, Inc. v. Oxy USA Inc.*, No. 18-1030-EFM-KGG, 2019 WL 3202257, at \*10 (D. Kan. 2019) (unpublished opinion); *Roderick*, 2016 WL 4039641, at \*11-12 ; *Fankhouser v. XTO Energy, Inc.*, No. CIV-07-798-L, 2012 WL 4815538, at \*4 (W.D. Okla 2012) (unpublished opinion).

The Class cites two Kansas Supreme Court cases that applied K.S.A. 16-201 to situations in which no royalty payment was made. See *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 467, 562 P.2d 1 (1977); *Schupbach v. Continental Oil Co.*, 193 Kan. 401, 408, 394 P.2d 1 (1964). But those cases are not helpful because they were decided before K.S.A. 55-1615 was enacted.

The Class also cites an order from a Kansas district court. In *Farrar v. Mobil Oil Corp.*, No. 01-CV-12 (Kan. 26th Jud. Dist. Ct. March 15, 2012), the district court ruled that "The legislative history of K.S.A. 55-1615 offered by plaintiffs clearly shows that this statute was designed to address the specific problem of lengthy suspensions of payments of royalties by producers, not their failure to pay royalties in the correct amount." But the court skipped the step of interpreting the plain language of the statute and we are not persuaded by the order.

The district court correctly ruled that K.S.A. 55-1615 controlled here.

We affirm the district court.

*The cross-appeal*

In its cross-appeal, OPIK contends that the district court erred by ruling that equitable estoppel barred its statute of limitations defense to its wrongful deduction of conservation fees before July 22, 2006. We agree with the district court.

The parties agree that OPIK provided check stubs to the royalty owners which reflected various deductions. One of the deductions was for a "State Production Tax," which included the state severance tax and conservation fees added together in one amount so that the check stubs made no indication to the royalty owners that any conservation fees were deducted.

The conservation fee is not a tax and the Kansas Supreme Court held it should not be deducted from royalty payments in *Hockett v. Trees Oil Co.*, 292 Kan. 213, 224, 251 P.3d 65 (2011). Despite this ruling, OPIK continued deducting the conservation fee as a tax until October 2015.

21

The evidence in the record on this fee is sparse. The class representative stated in a declaration that he relied on the accuracy of the check stubs on the deductions taken. He did not suspect that the "taxes" being deducted were not really taxes. He stated that if he had known, he would have acted sooner. An OPIK corporate representative testified that no royalty owner had asked for a specific listing of a deduction amount. She testified OPIK expected that the royalty owners would rely on the information that was on the check stubs. In her deposition, she testified she could not determine from the check stubs whether a conservation fee was deducted.

The district court found that by cashing the monthly checks and not questioning the deductions, the royalty owners demonstrated reliance on the check stubs being truthful and accurate. The court found that the Class had shown the three elements of estoppel:

> (1) OPIK made an affirmative representation on the check stubs that induced the royalty owners to believe the conservation fee was a tax when it was not, leading to a concealment of the conservation fee;
> (2) the royalty owners rightfully relied on the misrepresentation because they were not provided any other information about the "taxes" owed and OPIK expected the royalty owners to rely on the check stubs;
> (3) prejudice would result if OPIK could deny its deduction of conservation fees disguised as taxes.

The court held that OPIK's conduct had an "element of deception" to royalty owners who reasonably thought they were being charged a state tax. The practice was in fact deceptive, regardless of OPIK's intent. The court commented that "OPIK contends that royalty owners should have inquired as to what was under the State Tax column, but even OPIK did not know what exactly was contained in that aggregate number."

To us, OPIK argues the deduction of conservation fees as a tax was a good-faith mistake consistent with industry practice before the *Hockett* decision. OPIK contends estoppel cannot apply because it did not engage in stalling tactics to delay resolution of the claim until after the statute of limitations had run.

OPIK tries to minimize the harm flowing from its concealment. It argues that it did not misrepresent any facts. It never denied that it deducted the conservation fee. And there was no showing of any specific reliance by all of the royalty owners. After all, in OPIK's view, the amount deducted was less than $.18 each month and the royalty owners could have asked OPIK for details about the computation of the "state tax" deduction. Finally, OPIK argues equitable tolling should not be extended to all Class members based on one Class member's testimony.

The Class argues that OPIK is barred from asserting the statute of limitations because it did not raise it in the original appeal, and it is barred by the Supreme Court's mandate. But the statute of limitations was raised originally and was not an issue in the original appeal because the district court wanted to deal with it after the motions for summary judgment were resolved. In its grant of summary judgment, the district court stated:

> "Defendant alleges Plaintiff's claim is subject to a statute of limitations defense. If Defendant is correct, it is an affirmative defense and can be dealt with by this Court at a later time. It is not relevant for the Court to resolve the competing Motions for Partial Summary Judgment or the question of class certification."

Thus, the statute of limitations issue was properly before the court.

23

*We review several equitable estoppel principles.*

Under the doctrine of equitable estoppel, a person cannot take unfair advantage of another person by dishonest words or deeds, or failing to disclose an important fact, if those words, deeds, or silence induces that person to act in a certain way that results in an injury to the person taking the action. Indeed, a party can be equitably estopped from asserting the statute of limitations as a defense to a claim when a party conceals the facts giving rise to the claim. See *Bowen v. Westerhaus*, 224 Kan. 42, 45-46, 48, 578 P.2d 1102 (1978).

A party seeking equitable estoppel must show:

- The other party, by acts, representations, admissions, or silence when that other party had a duty to speak, induced the party asserting estoppel to believe certain facts existed;

- it reasonably relied and acted on such belief; and

- it would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Steckline Communications, Inc. v. Journal Broadcast Group of KS, Inc.*, 305 Kan. 761, 770, 388 P.3d 84 (2017).

Estoppel is an equitable doctrine that depends heavily on the circumstances of each case and should not be applied in a formulaic manner. *Steckline Communications, Inc.*, 305 Kan. at 770. A party invoking equitable estoppel need not show actual fraud, bad faith, or an attempt to mislead or deceive, but must show both misrepresentation and detrimental reliance. *Mutual Life Ins. Co. of New York v. Bernasek*, 235 Kan. 726, 730, 682 P.2d 667 (1984).

In *Dunn v. Dunn*, 47 Kan. App. 2d 619, Syl. ¶ 7, 281 P.3d 540 (2012), this court explained that silence can lead to equitable estoppel:

24

"The Kansas cases discussing the doctrine of equitable estoppel teach that fraud, bad faith, or the intent to deceive is not essential to create an estoppel. But using equitable estoppel to bar application of the statute of limitations requires an element of deception. A common factual thread running through the cases is conduct by a party that lulls the adverse party into a false sense of security, forestalling the filing of suit until the statute has run. On the other hand, equitable estoppel can arise from a party's silence when that party had a duty to speak. But in order to be estopped by silence, the defendant must have the intent to deceive, or at least a willingness that others would be deceived, and reason to believe that others would rely on such silence."

The defendant need not have planned or contrived with the deliberate intent to lull plaintiff into a false sense of security. But what must appear is some representation or conduct which amounts to an affirmative inducement sufficient to cause the plaintiff to delay bringing the action. *Coffey v. Stephens*, 3 Kan. App. 2d 596, 599-600, 599 P.2d 310 (1979).

In order to induce a court to apply the doctrine of estoppel to bar a statute of limitations defense, a plaintiff must prove an element of deception by the defendant on which the plaintiff acted in good faith and to the plaintiff's prejudice. Because of this deception, the plaintiff failed to file its lawsuit within the statutory period. *Dunn*, 47 Kan. App. 2d at 631.

But where information on a plaintiff's rights is available to the plaintiff, the plaintiff must use due care. Equitable estoppel is unavailable to one who has suffered loss solely because of their own acts or omissions. "'Equity aids the vigilant and not those who slumber on their rights.'" *Dunn*, 47 Kan. App. 2d at 630.

Equitable estoppel involves questions of fact. *Dunn*, 47 Kan. App. 2d 619, Syl. ¶ 8. This court reviews the district court's factual findings of misrepresentation or deception and detrimental reliance (or lack thereof) for substantial competent evidence.

25

See *Mutual Life Ins. Co. of New York*, 235 Kan. at 730. Substantial competent evidence is legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. Appellate courts do not reweigh conflicting evidence. *Geer v. Eby*, 309 Kan. 182, 190-91, 432 P.3d 1001 (2019).

*Why equitable estoppel applies here.*

We agree with the district court. OPIK's inclusion of the conservation fee as a tax—without so stating on the check stubs given to royalty owners—was an affirmative misrepresentation that was deceptive and induced royalty owners to believe the conservation fee was a tax. We hold that the district court's finding is supported by substantial competent evidence. The facts on this point are not disputed. OPIK provided check stubs to the royalty owners which reflected various deductions. One of the deductions was for a "State Production Tax," which included the state severance tax and conservation fees in one amount so that the check stubs made no indication that conservation fees were deducted. The conservation fee is not a tax and should not have been deducted as a tax. The Class did not have to show that OPIK's intent was to deceive or lull it into a false sense of security; the misrepresentation was sufficient.

The district court found that the royalty owners demonstrated reliance on the misrepresentation by cashing the monthly checks without questioning the deductions. The court found the reliance was reasonable because the royalty owners were not given any information on what taxes were owed, OPIK represented that the check stubs were truthful and accurate, and not even OPIK could easily tell what was in the state tax deduction. This finding makes sense. How are royalty owners going to reasonably question a deduction that is not even listed on the information given them? It was simply lumped in with another deduction for state taxes.

26

While the Class representative testified that he relied on the check stubs, OPIK challenges the lack of testimony showing reliance by the other Class members. We are not persuaded by this argument.

It would not be feasible to take the testimony of every Class member, and OPIK does not challenge the Class certification on appeal. Moreover, an inference of reliance by the Class is appropriate where circumstantial evidence used to show reliance is common to the whole Class. *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1090 (10th Cir. 2014.) Here, reliance by the Class members can be inferred because there is no other way to explain why they would not question the deduction. The only reasonable explanation is that the Class members relied on the misrepresentation. The district court found that OPIK concealed the conservation fee deduction. Thus, no Class member could have timely discovered their claims. See *Cooper Clark Foundation*, 58 Kan. App. 2d at 361-62.

The parties offer us conflicting federal caselaw about this issue. The cases have come to different conclusions on the reasonableness of reliance by royalty owners on the deductions listed on check stubs in similar contexts. In *Roderick*, 2016 WL 4039641, at *14, the court ruled that equitable estoppel did not bar a statute of limitations defense because the plaintiff had not "exercised any diligence that could have uncovered the deduction of conservation fees."

Then, in *Hitch Enterprises, Inc.*, 2019 WL 3202257, at *13, the court held that Oxy was equitably estopped from asserting a statute of limitations defense. The court refused to impose a requirement that the royalty owner verify the veracity of the check stubs, finding it was reasonable for Hitch to take Oxy at its word that it was not deducting processing fees.

It is not our task to resolve the apparent conflict of these rulings. But, to us, *Hitch* is more persuasive.

The district court found that the Class' reliance on the check stubs was reasonable. We do not reweigh evidence. See *Geer*, 309 Kan. at 191. OPIK admitted that it expected the Class to rely on the accuracy of the check stubs. It was not readily apparent that conservation fees were in the tax amount. It was reasonable for the Class to take OPIK at its word that the tax deduction was a deduction for taxes and nothing more.

Finally, the district court found that prejudice would result if OPIK could assert a statute of limitations defense to bar the claim. This finding is supported by substantial evidence. Even though the amount of money at issue for each Class member is minimal, it is prejudicial still.

In sum, this record demonstrates that OPIK misrepresented the deduction of a conservation fee as a tax deduction and it said so on each check stub. It was reasonable for the Class members to rely on that representation. And they were prejudiced by relying on that misrepresentation. We find no error in the district court's ruling that equitable estoppel barred OPIK's statute of limitations defense.

The district court is affirmed on direct appeal. OPIK's cross-appeal is denied.